United States District Court
Southern District of Texas
FILED

MAR 31 2000

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSEPH HUERTA, INDIVIDUALLY | § | |
| & AS NEXT FRIEND OF TRISTAN | § | |
| JOSEPH HUERTA, A MINOR CHILD | § | |
| | § | |
| v. | § | CIVIL ACTION NO. C-00-123 |
| | § | (Judge Janis Graham Jack) |
| VAIL CORPORATION, VAIL RESORTS, | § | |
| INC. AND CORPUS CHRISTI | § | |
| INSTITUTE OF PAIN MANAGEMENT | § | |

### VAIL DEFENDANTS' MOTION TO DISMISS, MOTION TO TRANSFER VENUE AND MEMORANDUM OF AUTHORITY

TO THE HONORABLE JANIS GRAHAM JACK:

Defendants Vail Corporation and Vail Resorts, Inc. (collectively the "Vail Defendants") file

this motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) and improper venue

under Rule 12(b)(3), and alternatively, motion to transfer venue under 28 U.S.C. § 1404 as follows:

### INTRODUCTION

1.      On February 15, 2000, Plaintiffs filed this lawsuit against the Vail Defendants and

Corpus Christi Institute of Pain Management in the 319TH Judicial District Court of Nueces County,

Texas.  Plaintiffs allege that the Vail Defendants were somehow negligent and caused Joseph

Huerta's skiing accident in Vail, Colorado.  In a completely separate claim, Plaintiffs allege medical

malpractice against Corpus Christi Institute of Pain Management arising out of the subsequent

rehabilitation of Mr. Huerta.  On March 24, 2000, the Vail Defendants removed this case based on

diversity of citizenship and the improper or fraudulent joinder of Corpus Christi Institute of Pain

Management.  The Vail Defendants now file this Motion to Dismiss under Rule 12 of the Federal

Rules of Civil Procedure for lack of personal jurisdiction and improper venue.  Alternatively, the

Vail Defendants request severance of the negligence claim asserted against them and transfer of that

claim to the District of Colorado.

## MOTION TO DISMISS FOR LACK OF PERSONAL
## JURISDICTION UNDER RULE 12(b)(2)

2.      "When a nonresident defendant moves to dismiss for lack of personal jurisdiction,

the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident."

*Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 753 (5TH Cir. 1996).  Personal jurisdiction must be

established over each defendant individually.  *See Pittsburgh Corning Corp. v. Walters,* 1 S.W.3d

759, 767 n.1 (Tex.App.—Corpus Christi 1999, no pet.).

### Vail Defendants Negate Jurisdiction by Proving They Are Non-Residents

3.      In their First Amended Petition, Plaintiffs do not allege that the Vail Defendants

committed any acts in Texas.  *See* First Amended Petition attached as Exhibit B to Notice of

Removal (Docket Entry 1).  Without jurisdictional allegations by Plaintiffs that the Vail Defendants

have committed any act in Texas or directed any conduct toward Texas, Vail Corporation and Vail

Resorts, Inc. can each negate jurisdiction by simply establishing that they are non-residents.

*Siskind v. Villa Foundation for Education, Inc.*, 642 S.W.2d 434, 438 (Tex. 1982) (holding that a

non-resident defendant sustains its burden to negate all bases of personal jurisdiction by proving it

-2-

is a non-resident when the plaintiff fails to allege any act by the defendant in Texas); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.—Dallas 1993, writ denied).

4.      Under the Texas Civil Practice and Remedies Code, a foreign corporation is a non-resident. TEX. CIV. PRAC. & REM. CODE § 17.041(2). Thus, Vail Corporation and Vail Resorts, Inc. must simply prove that they are foreign corporations. An Affidavit of Andy Daly ("Daly Affidavit"), the president of Vail Corporation and Vail Resorts, Inc. is attached hereto as Exhibit A and incorporated by reference as if fully set forth herein. According to Mr. Daly, Vail Corporation is a Colorado corporation with no offices or employees in Texas. *See* Daly Affidavit, p. 2. Similarly, Vail Resorts, Inc. is a Delaware corporation with no offices or employees in Texas. *See* Daly Affidavit, p. 1. In fact, in their First Amended Petition, Plaintiffs recognize that Vail Corporation and Vail Resorts, Inc. (i) are foreign corporations; (ii) have their "principal place of business in the State of Colorado;" and (iii) must be served through their registered agent in Colorado. *See* First Amended Petition, p. 1. Furthermore, Vail Corporation and Vail Resorts, Inc. are not authorized to do business in Texas, and have not designated a Texas agent for service of process. *See* Daly Affidavit, p. 2. Accordingly, the Vail Defendants have met their burden of negating all bases of personal jurisdiction and must be dismissed under Rule 12(b)(2). *See Siskind*, 642 S.W.2d at 438.

### Exercise of Personal Jurisdiction over Vail Defendants Violates the Due Process Clause of the Fourteenth Amendment

5.      Even if the Court were to allow Plaintiffs to add jurisdictional allegations to their Complaint, Plaintiffs' claims against the Vail Defendants must be dismissed because the exercise of personal jurisdiction by this Court over the Vail Defendants would be inconsistent with due process.

6.     In diversity cases, the existence of personal jurisdiction is a two-step analysis. First, the court must determine whether the law of the forum state permits the exercise of jurisdiction over the defendant. *Jobe*, 87 F.3d at 753 (citing *Smith v. DeWalt Products Corp.*, 743 F.2d 277, 278 (5TH Cir. 1984)). Second, the exercise of jurisdiction under state law must comport with the Fourteenth Amendment due process clause." *Id.* However, courts have held that the Texas long-arm statute stretches to the limits of federal due process. *Wilson v. Belin*, 20 F.3d 644, 647 (5TH Cir.), *cert. denied*, 115 S. Ct. 322 (1994). Thus, the inquiry turns on whether the exercise of personal jurisdiction over the Vail Defendants comports with the due process clause of the Fourteenth Amendment. *Id.*

### Vail Defendants Lack Sufficient Contacts to Justify the Exercise of Personal Jurisdiction

7.     Due process clause analysis under the Fourteenth Amendment has two components. The first prong of the analysis is that the nonresident defendant must have "purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with that forum state." *Wilson*, 20 F.3d at 647 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 315-17 (1945)). This "purposeful availment" requirement ensures that a non-resident defendant will not be hailed into a jurisdiction based upon "random," "fortuitous," or "attenuated" contacts or the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993) ("This rule of law has been truncated in the minds and jargon of lawyers to 'minimum contact'; however, minimum contact does not mean 'minimal' or 'slight' contact"). The second prong is that

-4-

the exercise of personal jurisdiction over the nonresident defendant must not "offend traditional notions of fair play and substantial justice." *Wilson*, 20 F.3d at 647 (quoting *Asahi Metal Industry Co., Ltd. v. Superior Court of Cal., Solano County*, 480 U.S. 102 (1987)).

8.     The purposeful availment prong of the due process analysis is twofold, as the *Wilson* court explained:

> [T]he inquiry may be further subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. Specific jurisdiction is appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. General jurisdiction, however, will attach, even if the nonresident defendant's contacts with the forum state are not directly related to the cause of action, if the defendant's contacts with the forum state are both "continuous and systematic."

*Wilson*, 20 F.3d at 647 (citations omitted).

### *No Specific Jurisdiction Over Vail Defendants*

9.     The Vail Defendants' lack of contacts with Texas negate specific personal jurisdiction.  *See* Daly Affidavit, pp. 1-3.  Plaintiffs allege that acts or omissions of the Vail Defendants somehow caused injury to Joseph Huerta while skiing at the Vail Ski Area in Vail, Colorado.  However, there are no allegations that the Vail Defendants *did anything wrong in Texas* that caused Joseph Huerta's injury or alleged damages.  With no allegations or evidence of a breach of duty by the Vail Defendants occurring in Texas, this Court cannot exercise specific jurisdiction over either of the Vail Defendants.

10.     The Vail Defendants have no contacts with Texas.  *See* Daly Affidavit, pp. 1-3.  Vail Corporation is a Colorado corporation with its principal place of business in Colorado.  *See* Daly

Affidavit, p. 2. Vail Resorts, Inc. is a Delaware corporation with its principal place of business in Colorado. *See* Daly Affidavit, p. 1. Neither company maintains an office outside of the State of Colorado. *See* Daly Affidavit, pp. 1-2. Neither of the Vail Defendants are authorized to do business in Texas, and neither have a registered agent in Texas. *See* Daly Affidavit, p. 2. The Vail Defendants have no property or assets in Texas. *See* Daly Affidavit, p. 2. The Vail Defendants do not advertise the Vail Ski Area in any Texas magazines or newspapers. *See* Daly Affidavit, p. 2. The Vail Defendants do not send mass mailings to Texas for marketing purposes. *See* Daly Affidavit, p. 2. Thus, the Vail Defendants have virtually no contacts with the State of Texas. *See* Daly Affidavit. Plaintiffs therefore cannot meet their burden to establish specific jurisdiction over the Vail Defendants. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 595-96 (5TH Cir. 1999).

### *No General Jurisdiction Over Vail Defendants*

11. Additionally, the Vail Defendants are not subject to the general jurisdiction of this Court. General jurisdiction over the Vail Defendants requires "continuous and systematic" contacts by each of these Defendants with Texas, which do not exist. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984); *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694 (5TH Cir. 1999); *Bullion v. Gillespie*, 895 F.2d 213, 216 (5TH Cir. 1990). Additionally, if the non-resident defendant's contacts are unrelated to the cause of action, the Supreme Court requires that the contacts must be substantial. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

12.     Personal jurisdiction cases most analogous to this one involve personal injuries at out-of-state resorts.  For example, the Corpus Christi Court of Appeals recently held that Texas courts had no personal jurisdiction over M.G.M. Grand Hotel, Inc. for personal injury claims that allegedly occurred when Texas residents were guests of the M.G.M. Grand Hotel in Las Vegas, Nevada.  *M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 412 (Tex.App.—Corpus Christi 1999, no pet.) (copy attached as Exhibit B).  The *Castro* court adopted the solicitation-plus doctrine which requires more than solicitation of business in a state to be subject to its jurisdiction.  *Id.* at 410-11.  Even though some evidence indicated that M.G.M. had advertised in Texas, the Corpus Christi Court of Appeals found these contacts to be insufficient to confer personal jurisdiction over M.G.M. in Texas.  *Id.* at 412.  In contrast with *Castro*, Plaintiffs here can produce no evidence that either of the Vail Defendants has purposely availed itself of the jurisdiction of Texas courts.

13.     Additionally, in *Blanks v. Taos Ski Valley, Inc.*, 706 F. Supp. 515 (E.D. Tex. 1988), the court found that it lacked personal jurisdiction despite the Taos Ski Valley's solicitation of Texas residents to ski at its resort in New Mexico.  Plaintiff presented evidence that Taos attended ski shows in Texas, advertised in a Houston newspaper, mailed literature to Texans, and sent representatives to meet with travel agents in Texas.  Despite the extent of these contacts, the court found that they lacked a nexus to the lawsuit and were insufficient to subject the defendant to personal jurisdiction.  *Id.* at 517.  Here, in comparison to the Taos Ski Valley defendant, the Vail Defendants have virtually no contacts with Texas, and can not be subject to the jurisdiction of Texas courts.

14.     Other out-of-state resort cases considered by the Fifth Circuit have reached the same result. *See Turner v. Jack Tar Grand Bahama, Ltd.*, 353 F.2d 954 (5TH Cir. 1965) (finding no personal jurisdiction despite defendant's solicitation of business in Texas, and the fact that defendant's officers and directors lived and frequently held management meetings in Texas); *Gardemal v. Westin Hotel Co.*, 186 F.3d 588 (5TH Cir. 1999) (holding that Texas courts had no personal jurisdiction over Westin Hotel defendants because the evidence of contacts with Texas residents was too vague to support jurisdiction).

15.     In other types of cases, the Fifth Circuit has found jurisdiction lacking in the face of far more extensive contacts than those in this case. For example, in *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 372-73 (5TH Cir. 1987), the court held that the acts of a foreign manufacturer did not constitute "continuous and systematic contacts" with the forum state even though the foreign defendant sold its products through a distribution network of dealers in the forum state, advertised its products in the forum state, and thereby conducted nearly $250 million of business in the forum state. The court explained that because the manufacturer had no direct control over the dealers in the forum, had no agents in the forum, was not qualified to do business in the forum, and had no telephone listing, warehouse or manufacturing facilities, and no bank accounts in the forum, it was not subject to the jurisdiction of the forum state. *Id.* at 372. In stark contrast with the contacts in *Bearry*, the Vail Defendants lack any continuous and systematic contacts with Texas. *See* Daly Affidavit, pp 1-3. Here the Vail Defendants' contacts with Texas are non-existent, wholly unrelated to the cause of action, and are certainly not substantial enough to satisfy the *World-Wide* test. *See*

*World-Wide Volkswagen*, 444 U.S. at 297.  Therefore, no general personal jurisdiction exists over either of the Vail Defendants.

### Exercise of Personal Jurisdiction over Vail Defendants Does Not Comport With the Fairness Test of the Fourteenth Amendment Due Process Clause

16.     As set forth above, the Vail Defendants do not have sufficient minimum contacts with Texas to meet the purposeful availment test of *Wilson*, and the Court need go no further to dismiss the Vail Defendants.  *See, e.g., Preussag Akt. v. Coleman*, No. 01-99-00502-CV, slip op. at 32, 2000 WL 330181, at *11 (Tex.App.—Houston [1ST Dist.] Mar. 30, 2000, n.w.h.) (copy attached as Exhibit C).  However, analysis of the second prong of the due process test further demonstrates the lack of personal jurisdiction over the Vail Defendants.  The second prong of the due process analysis relates to the traditional notions of fair play and substantial justice; in other words, the unfairness of forcing a non-resident to defend an action in a distant forum.  That analysis considers a number of factors:

> (1) [T]he burden upon the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several States in furthering fundamental substantive social policies."

*Wilson*, 20 F.3d at 647 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

17.     Applying the *World-Wide Volkswagen* factors shows that forcing the Vail Defendants to defend themselves in Texas does not meet the fairness test of the Fourteenth Amendment.  The Vail Defendants' defense would be prejudiced because their witnesses, resources, and documents are

-9-

located in Colorado. *See* Daly Affidavit, pp.3-7. The Vail Defendants will be unable to secure the attendance in Texas of many of its most important witnesses. Additionally, the Vail Defendants would incur a staggering expense if they were forced to defend this suit in Texas. *See* Daly Affidavit, pp. 3-7. Colorado has a substantial interest in the resolution of disputes involving its primary industry - - snow skiing. Plaintiffs will be equally able to pursue their claim against the Vail Defendants in Colorado, and will not be prejudiced if this Court requires them to proceed in that forum. The resolution of Plaintiffs' claim will be more efficient in Colorado than in Texas because of the fewer number of cases on file in Colorado and a Colorado court's ease in applying Colorado law to the facts of the case. For these reasons, the balance of fairness weighs in favor of the claim against the Vail Defendants proceeding in Colorado, not Texas. *World-Wide Volkswagen*, 444 U.S. at 292.

18.     Thus, because the Vail Defendants have no contacts with Texas, and certainly none that are related to Plaintiffs' claim; and because any contacts that may exist are not continuous and systematic enough to support the exercise of general personal jurisdiction, the Vail Defendants' motion to dismiss for lack of personal jurisdiction should be granted. Furthermore, the Vail Defendants' motion should be granted because the exercise of personal jurisdiction over the Vail Defendants does not meet the fairness test in the due process clause of the Fourteenth Amendment. *See Gardemal*, 186 F.3d at 596; *Turner*, 353 F.2d at 956; *Castro*, 8 S.W.3d at 411-12.

-10-

## MOTION TO DISMISS FOR IMPROPER VENUE UNDER RULE 12(b)(3)

19.     Dismissal under Rule 12(b)(3) is also required because venue of the claim against the

Vail Defendants is not proper in the Southern District of Texas.  Under 28 U.S.C. § 1391(a), venue

is proper only in: (1) a district where any defendant resides, if all defendants reside in the same state;

(2) a district in which a substantial part of the events or omissions giving rise to the claim occurred;

or (3) a district in which any defendant is subject to personal jurisdiction, if there is no other proper

district.  28 U.S.C. § 1391(a)  All Defendants do not reside in the same state, thus the first venue

option does not apply.  *See* Daly Affidavit, p. 1-2.  All of the acts or omissions alleged against the

Vail Defendants occurred in Colorado.  *See* Daly Affidavit, pp. 1-3.  Plaintiffs cannot establish that

a substantial part of the events or omissions giving rise to their claim against the Vail Defendants

occurred in the Southern District of Texas.  Since venue is proper in the District of Colorado under

the second venue option, the third venue option does not apply.  28 U.S.C. § 1391(a).  The District

of Colorado is therefore the only district of proper venue as to the claims against the Vail

Defendants.

20.     The Vail Defendants request that Plaintiffs' negligence claim be dismissed for

improper venue, or alternatively, that the claim against the Vail Defendants be severed and

transferred to the District of Colorado, the only district of proper venue for the negligence claim

against the Vail Defendants.  *See Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 296 (3RD

Cir. 1994).

## MOTION TO TRANSFER VENUE UNDER 28 U.S.C. § 1404

21.     In the alternative, without waiving their RULE 12(b) personal jurisdiction and venue

motions, the Vail Defendants move for a transfer of venue under 28 U.S.C. § 1404(a) of the

negligence claim asserted against them because the convenience of the parties and witnesses justifies

such a transfer.  The interests of justice will also be served by a transfer of venue of the negligence

claim against the Vail Defendants to the District of Colorado.  Additionally, transfer under § 1404

is a proper mechanism to cure the lack of personal jurisdiction against the Vail Defendants.  *See*

*Blanks v. Taos Ski Valley, Inc.*, 706 F. Supp. 515, 517 (E.D. Tex. 1988).

### Venue is Proper in the District of Colorado

22.     The requirement of § 1404(a) that the transferee district be one in which the action

"might have been brought" is satisfied here.  Venue under § 1391(a) is proper in the district in which

a substantial part of the events or omissions giving rise to the claim occurred.  28 U.S.C. § 1391(a).

As set forth above, the alleged facts giving rise to Joseph Huerta's negligence claim against the Vail

Defendants from his skiing accident occurred entirely within the State of Colorado.  The ski area

where Mr. Huerta was allegedly injured is the Vail Ski Area resort located in Vail, Colorado; the

operation and maintenance of the ski area was performed in Colorado; any failure to warn or

construct sufficient physical barriers occurred in Colorado; and Mr. Huerta's injury was first treated

in Colorado.  Thus, venue of the Plaintiffs' negligence claim against the Vail Defendants is proper

in the District of Colorado under § 1391(a).

## Convenience Factors

23.     The factual circumstances of each case should be analyzed in deciding whether the convenience of the parties and witnesses requires transfer under § 1404(a). *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964). The factors that determine whether to transfer based on inconvenience are set out in *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947). Although all of the *Gulf Oil* factors do not apply to every case, the following issues should be considered here.

### *Inconvenience to and Ability to Compel Attendance of Vail Defendants' Witnesses*

24.     For purposes of determining whether transfer of venue is warranted, the availability and convenience of witnesses is the most important factor to be considered. *LeBouef v. Gulf Operators, Inc.*, 20 F. Supp.2d 1057, 1060 (S.D. Tex. 1998). All of the material witnesses for the claim against the Vail Defendants reside in Colorado. Specifically, as more fully described in the affidavit of Andy Daly attached as Exhibit A, at least eighteen (18) witnesses reside in Colorado and would be forced to travel to Corpus Christi, Texas for trial, if their attendance could even be compelled by the Vail Defendants. These witnesses include ski area employees who have knowledge of the conditions at the ski area and the nature of the Plaintiff's accident. The witnesses also include experts in mountain grooming procedures, patrol operations, trail checks, snowmaking, slope design and mountain operations. Many of these witnesses are seasonal employees and therefore cannot be compelled to appear for deposition or trial in Texas during the six to eight months that they are not employed by Vail Resorts, Inc.

-13-

25. Immediately after the accident, Joseph Huerta received extensive medical treatment in Colorado. Plaintiff was admitted to Vail Valley Medical Center and was treated by doctors and other medical professionals or health care providers there including Dr. Robert Gurner and Dr. Todd Nielson. *See* Daly Affidavit, p. 6. Other health care professionals whose identities are presently unknown were also involved in treating Joseph Huerta in Colorado. All of these medical witnesses have knowledge about the diagnoses, treatment, and anticipated prognosis of Mr. Huerta. All of these medical witnesses are located in Colorado, none of them are employees of the Vail Defendants, and none could be compelled to appear at a trial in Texas. They are all beyond the jurisdiction of this Court. The ability of the Vail Defendants to defend Plaintiffs' claim will be prejudiced, if not paralyzed, without the testimony of these witnesses, which cannot be assured if the case is tried in Texas. Therefore, this Court should sever the negligence claim against the Vail Defendants and transfer it to the District of Colorado. *See Robertson v. M/V Cape Hunter*, 979 F. Supp. 1105, 1107 (S.D. Tex. 1997).

### *Colorado's Public Interest*

26. The public interest factor also favors a trial in Colorado because Colorado has a substantial interest in litigation arising from a Colorado-based ski area. *See* Daly Affidavit, p. 6-7. The United States Supreme Court has confirmed that "[t]here is a local interest in having localized controversies decided at home." *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947). Furthermore, disputes should be determined in the place of the alleged wrong. *See Robertson*, 979 F. Supp. at

-14-

1108. Thus, this case should be transferred to the District of Colorado because that is where the allegedly negligent conduct by the Vail Defendants, if any, occurred.

### *Application of Colorado Law*

27.     The interests of justice are promoted by "having the trial of a diversity case in a forum that is at home with the state law that must govern the case." *Van Dusen v. Barrack*, 376 U.S. 612, 645 (1964). Here, Plaintiffs' negligence claim against the Vail Defendants is indisputably governed by the laws of the State of Colorado. *See Continental Oil Co. v. General American Transportation Corp.*, 409 F. Supp. 288 (S.D. Tex. 1976). The law of Colorado can be best construed by the courts of that state.

28.     The convenience of the parties and witnesses will be served and it is in the interest of justice that this action be transferred to the District of Colorado.

### PRAYER

For these reasons, the Vail Defendants pray that Plaintiffs' claim against them be dismissed for lack of personal jurisdiction and venue; or in the alternative, that the claim against the Vail Defendants be severed and transferred to the District of Colorado; and, for all other further relief, legal and equitable, to which the Vail Defendants may be entitled.

Respectfully submitted,

*Tracie J. Renfroe*

Tracie J. Renfroe
TBA No. 16777000
Federal Admission No. 5465
Attorney-in-Charge

711 Louisiana Street, Suite 2900
Houston, Texas 77002-2781
(713) 223-2900 (Phone)
(713) 221-2123 (Fax)

**Counsel For Defendants Vail
Corporation and Vail Resorts, Inc.**

OF COUNSEL:

M. Colleen McHugh
TBA No. 00000071
Federal Admission No. 978
Bracewell & Patterson, L.L.P.
2000 One Shoreline Plaza - South Tower
800 N. Shoreline Blvd.
Corpus Christi, Texas 78401-3700
(361) 882-6644 (Phone)
(361) 882-6659 (Fax)

M. Coy Connelly
TBA No. 00793541
Federal Admission No. 19410
Bracewell & Patterson, L.L.P.
711 Louisiana Street, Suite 2900
Houston, Texas 77002-2781
(713) 223-2900 (Phone)
(713) 221-2159 (Fax)

## CERTIFICATE OF CONFERENCE

On March 31, 2000, I conferred with Juan Mejia, counsel for Plaintiffs, and Michele Quattlebaum, counsel for the Corpus Christi Institute of Pain Management, regarding their opposition to the Vail Defendants' Motion to Transfer Venue under § 1404. Mr. Mejia opposes the relief sought by the Vail Defendants. Ms. Quattlebaum agrees to the transfer of venue of the claim against the Vail Defendants to the District of Colorado.

_____
Tracie J. Renfroe

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Vail Defendants' Motion to Dismiss, Motion to Transfer Venue and Memorandum of Authority has been served on the following counsel by certified mail, return receipt requested, on this the 31st day of March, 2000.

Mr. Mikal C. Watts
Harris & Watts, P.C.
555 N. Carancahua, Suite 1400
Corpus Christi, Texas 78478

Ms. Michele Quattlebaum
Preston & Cowan, L.L.P.
1150 First City Tower
1001 Fannin Street
Houston, Texas 77002

_____
Tracie J. Renfroe

-17-

A

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOSEPH HUERTA, INDIVIDUALLY          )
& AS NEXT FRIEND OF TRISTAN          )
JOSEPH HUERTA, A MINOR CHILD         )
                                     )
v.                                   )          CIVIL ACTION NO. C-00-123
                                     )
VAIL CORPORATION, VAIL RESORTS,      )
INC. AND CORPUS CHRISTI              )
INSTITUTE OF PAIN MANAGEMENT         )

## AFFIDAVIT OF ANDY DALY

STATE OF COLORADO          )
                           )
COUNTY OF EAGLE            )

Andy Daly, being duly sworn, deposes and says:

1.      I am the President and Chief Executive Officer of Defendant The Vail Corporation, and
        President of Vail Resorts, Inc. (collectively the "Vail Defendants"). I am over the age of
        eighteen and authorized by the Vail Defendants to make this affidavit. I have personal
        knowledge of facts contained in this affidavit and the Vail Defendants' motion to dismiss
        or, in the alternative, to transfer this case to Colorado, and they are true and correct. I
        respectfully submit this affidavit in support of these motions.

2.      I have been informed that Plaintiff has commenced an action against the Vail Defendants
        in state district court in Nueces County, Texas, to recover damages for personal injuries
        as the result of an accident which allegedly occurred on a ski slope at the Vail Ski Area
        on March 17, 1998. Plaintiff alleges that the Vail Defendants were negligent in the
        operation of the ski slope.

3.      Although the Vail Defendants deny all allegations of the negligence claim, it is
        undisputed that all of the allegedly wrongful conduct of the Vail Defendants and the
        alleged consequential injury to Plaintiff occurred in Colorado.

4.      Vail Resorts, Inc. is incorporated under the laws of the State of Delaware with its
        principal place of business in Eagle County, Colorado. Vail Resorts, Inc. has no offices
        or employees anywhere in the United States except Colorado.

5.      The Vail Corporation is incorporated under the laws of the State of Colorado with its principal place of business in Eagle County, Colorado.  The Vail Corporation has no offices or employees in the Sate of Texas.

6.      The Vail Defendants have never been authorized to do, nor have they been, doing business in the State of Texas.

7.      The Vail Defendants have never applied for a license or other qualification to do business in the State of Texas, and are not licensed or so qualified.  Nor have they been doing any business in Texas.

8.      The Vail Defendants have not maintained and have never maintained, any office or other facilities in the State of Texas, nor have they ever owned, rented or leased any real property or guaranteed any leases there.

9.      The Vail Defendants do not maintain any movable property, funds, or other assets of any nature in the State of Texas.

10.     The Vail Defendants store no records, files, correspondence, or other documents in Texas.

11.     The Vail Defendants do not contract in the State of Texas for advertising in magazines, newspapers or any other media relative to Vail Ski Area nor has it hired nor maintained any marketing entity to do so on their behalf.

12.     The Vail Defendants send no direct mass mailing into the State of Texas for marketing purposes.

13.     The Vail Defendants have never commenced a lawsuit in the State of Texas.

14.     The Vail Defendants do not own any stock, or any other legal interest, in any entity incorporated in, qualified to do business in, or doing business in Texas.

15.     The Vail Defendants have no corporate or partnership subsidiaries or affiliates in the State of Texas.

16.     The Vail Defendants have not consented to jurisdiction in the State of Texas.

17.     Within the State of Texas, the Vail Defendants:

         a.      have no officers, directors, board members, employees, or agents;
         b.      have no affiliates or subsidiaries that engage in business on their behalf;
         c.      have no agent authorized to act on their behalf;
         d.      engage in no systematic or persistent course of conduct;

e.   derive no material revenue from goods used or consumed or services rendered;

f.   have no office, place of business or business records;

g.   have no registered agent for service of process;

h.   possess no authority or license to do business;

i.   conduct no business;

j.   have no Texas telephone number or listing;

k.   have no mailing address;

l.   have no bank account;

m.   have never commenced a lawsuit;

n.   have never lent assets to anyone.

18.   The Vail Defendants have never consented, nor contemplated, that they would be subject to the jurisdiction of the courts of Texas.

19.   In all respects, it would be convenient and appropriate to try this case in Colorado. Conversely, it would severely prejudice Defendants and other lay and expert witnesses were this case to proceed in Texas as virtually all of the lay witnesses and most expert witnesses on liability and damages reside in Colorado.

20.   Because this accident occurred in Colorado, crucial witnesses are residents of Colorado and cannot be compelled to appear and testify in a Texas trial. These witnesses include ski area employees at the time of the accident who have knowledge of the conditions at the scene and the nature of the Plaintiff's accident. Many of the following employees are seasonal and therefore cannot be compelled to appear for deposition or trial purposes in Texas during the six to eight months they are not employed by the Vail Defendants.

21.   Potential witnesses include the following:

a.   Marvin Gray, P. O. Box 7, Vail, Colorado, 81658. Mr. Gray was a summer equipment operator and is supervisor of slope maintenance. Mr. Gray is still an employee of Vail and lives in Eagle County, Colorado. He may be called to testify as to grooming procedures and practices and other relevant issues.

b.   Brian McCartney, P.O. Box 7, Vail, Colorado, 81658. Mr. McCartney was the Director of Mountain Operations for Vail, and is ski patrol director and is still employed by Vail, and lives in Vail, Colorado which is located in Eagle County. He has knowledge and information as to general patrolling and trail check procedures, protocol, and other relevant issues. Additionally, Mr. McCartney assisted in the rendering of first aid at the accident site.

c.   Craig Poff, P.O. Box 7, Vail, Colorado, 81658. Mr. Poff was a Vehicle Operator foreman and a patroller who responded immediately to this accident. He rendered first aid at the accident site. Mr. Poff is a Colorado resident who is employed seasonally by Vail. While during the ski season he is employed by Vail,

throughout the remaining six months of the year, he is not a Vail employee. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

d.  Jessica Guthrie, P.O. Box 7, Vail, Colorado, 81658. Ms. Guthrie was a member of the skier services crew and a patroller who investigated this accident. Ms. Guthrie took photos of the scene, measurements of the scene, and constructed a diagram of the scene. She may be called to testify with regard to the same. Ms. Guthrie is a Colorado resident who is employed seasonally by Vail. While during the ski season, she is employed by Vail, throughout the remaining six months of the year she is not a Vail employee. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

e.  Julie Rust, P.O. Box 7, Vail, Colorado, 81658. Ms. Rust was a Ski Patrol Foreman who responded immediately to this accident. She rendered first aid at the accident site. Ms. Rust is a Colorado resident who is employed year round by Vail. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

f.  Tee Fox, P.O. Box 7, Vail, Colorado, 81658. Mr. Fox was the Ski Patrol Master who responded immediately to this accident. He rendered first aid at the accident site. Mr. Fox is a Colorado resident who is employed seasonally by Vail. While during the ski season he is employed by Vail, throughout the remaining six months of the year, he is not a Vail employee. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

g.  Steve Clark, P.O. Box 7, Vail, Colorado, 81658. Mr. Clark was a patroller who responded immediately to this accident. He rendered first aid at the accident site. Mr. Clark is a Colorado resident who is employed seasonally by Vail. While during the ski season he is employed by Vail, throughout the remaining six months of the year, he is not a Vail employee. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

h.  Henry Davison, P.O. Box 7, Vail, Colorado, 81658. Mr. Davison was a patroller who responded immediately to this accident. He rendered first aid at the accident site. Mr. Davison is a Colorado resident who is employed seasonally by Vail. While during the ski season he is employed by Vail, throughout the remaining six months of the year, he is not a Vail employee. Vail has no ability to compel this witness to attend a trial in Texas. Yet, without the availability of this witness, Vail's defense of this case would be prejudiced.

-4-

i.  Sarah Ries, P.O. Box 7, Vail, Colorado, 81658. Ms. Ries was a patroller who responded immediately to this accident. She rendered first aid at the accident site. Ms. Ries is no longer employed by Vail.

j.  Dan Walcher, P.O. Box 7, Vail, Colorado, 81658. Mr. Walcher is a supervisor for the Vail Ski Patrol and would be called with respect to his knowledge of patrol operations and trail checks as well as other relevant issues. Mr. Walcher is still employed by Vail and resides in Eagle County, Colorado.

k.  Jeff Spofford, P.O. Box 7, Vail, Colorado, 81658. Mr. Spofford was a patroller who transported Plaintiff's sister, Ms. Lisa Huerta, to the ambulance pickup point at Vail Village. Mr. Spofford additionally assisted in the investigation of the subject accident. Mr. Spotford may be called to testify as to these matters. Mr. Spofford is still employed by Vail.

l.  Paul Fillian, P.O. Box 7, Vail, Colorado, 81658. Mr. Fillian was a snow making supervisor prior to Plaintiff's accident on March 13, 1998. Mr. Fillian may be called with respect to his knowledge of snowmaking operations and other relevant issues. Mr. Fillian is still employed by Vail and lives in Eagle County, Colorado.

m.  Mike Larson, P.O. Box 7, Vail, Colorado, 81658. Mr. Larson was the Managing Director of Lift Operations and is in charge of mountain planning. Mr. Larson may be called to testify with respect to the overall mountain plan slope design as well as other relevant issues. Mr. Larson is still employed by Vail and resides in Eagle County, Colorado.

n.  Frank McNeil, P.O. Box 7, Vail, Colorado, 81658. Mr. McNeil was the Skier Services Supervisor for Vail Associates which includes mountain services personnel. Mr. McNeil may be called to testify with respect to mountain information provided to skiers as well as other relevant issues. Mr. McNeil is still employed by Vail and resides in Eagle County, Colorado.

o.  Rob Andrews, Risk Manager, P.O. Box 7, Vail Colorado, 81658. Mr. Andrews is the Director of risk management for Vail Associates. Mr. Andrews additionally inspected the subject accident site and may be called to testify with respect to his inspection as well as other relevant issues. Mr. Andrews is still employed by Vail and resides in Eagle County.

p.  Susan Hendry, Risk Management, P.O. Box 7, Vail, Colorado, 81658. Ms. Hendry inspected the subject accident site and assisted in the accident investigation. Ms. Henry may be called to testify with respect to her site inspection and investigation performed, as well as other relevant matters. Ms. Hendry is still employed by Vail and resides in Summit County.

-5-

q.  Paul Testwuide, P.O. Box 7, Vail, Colorado, 81658.  Mr. Testwuide is in charge of mountain operations.  Mr. Testwuide may be called to testify with respect to overall operations, patrol, and grooming activities and as to the general conditions on Riva Ridge as well as other relevant issues.  Mr. Testwuide is still employed by Vail and resides in Eagle County.

r.  Dr. Robert Gurner, c/o Vail Valley Medical Center, 181 West Meadow Drive, Vail, Colorado, 81658.  Dr. Gurner was an emergency room doctor who performed initial treatment on Mr. Huerta and may be called to testify with regard to same.  Dr. Garner is a resident of Eagle County, Colorado

22.  Immediately after the accident, Plaintiff received extensive medical treatment in Colorado.  Plaintiff was admitted to Vail Valley Medical Center and was treated by doctors and other medical professionals or health care providers there including Drs. Robert Gurner and Todd Nielson, as well as presumably other health care professionals whose identities are presently unknown, treated the Plaintiff in Colorado and may be called to testify with respect to their diagnosis, their treatment, and anticipated prognosis. None of these medical witnesses, although located in Colorado, are employees of Vail and therefore could not be compelled to appear at a Texas trial.  They would be beyond the process of the court and Vail's ability to defend this case would be hampered and prejudiced if the case was to proceed in Texas.

23.  Moreover, Defendants believe that a jury viewing of the accident scene would be very beneficial to provide a jury panel with perspective.  Should the Court determine that a jury viewing would be appropriate, this would be possible only if the case were pending in Colorado.

24.  Travel by Defendants and their witnesses to the State of Texas for depositions and the trial of this action would impose substantial economic hardship.  Vail's business operations, though most heavily involved with the public in winter, are conducted on a year round basis.  Non skiing days are devoted to maintenance and development of the ski area and its operations and thus non skiing season are times that are as busy as the winter ski season for management personnel.

25.  Skiing is a very important industry in our state.  I have been informed that statistics gathered by Colorado Ski Country, the state trade association, show that the major Colorado ski areas had over 11 million skier visits last year.  More than 3 times our total resident population of just over 3 million and, over 55% of these skier visits are from non residents of Colorado, including Texans and residents of virtually every other state and many foreign countries.  It is unfortunate, but nevertheless true, that a significant number of skiers and other visitors to our recreational facilities are injured every season.  To require management and employees of Vail or other Colorado ski areas to be brought into court throughout the United States wherever a person injured at Vail or another Colorado

-6-

ski area happens to reside, would severely and unduly disrupt the ongoing operations of the ski area and have a substantial detrimental impact on this most important component of Colorado's economy.

_(signature)_
Andy Daly

STATE OF COLORADO )
)
COUNTY OF EAGLE )

The foregoing Affidavit of Andy Daly was acknowledged before me this day of _____, 2000, by Andy Daly.

Witness my hand and official seal.

_(seal: ISABEL D. THOMPSON NOTARY PUBLIC STATE OF COLORADO)_

_(signature)_
Notary Public

My Commission expires:

My Commission Expires 09/12/2001

Business or residence address of Notary Public: PO Box 959
Kron Co 81620

-7-

B

8 S.W.3d 403
(Cite as: 8 S.W.3d 403)

Page 1

**M.G.M. GRAND HOTEL, INC., Appellant,**
v.
**Lee CASTRO and Felix Barragan, Appellees.**

No. 13-99-023-CV.

Court of Appeals of Texas,
Corpus Christi.

Dec. 9, 1999.

Spectators at boxing match brought suit against out-of-state hotel where match took place, alleging injuries in connection with unruly crowd. Hotel contested personal jurisdiction though special appearance. The County Court at Law, Hidalgo County, Federico Garza, Jr., J., denied special appearance. Hotel took interlocutory appeal. The Court of Appeals, Dorsey, J., held that: (1) vice president and secretary of hotel corporation was competent to testify by affidavit as to facts regarding the corporation's contacts with state, for purposes of defeating personal jurisdiction, without showing affirmatively how he obtained personal knowledge of such facts, and (2) allegations that out-of-state resort hotel encouraged local travel industry companies to sell tickets to state residents for events at hotel and advertised in those companies' promotional materials were insufficient to show the continuous and systematic contacts necessary for the exercise of general jurisdiction over hotel.

Dismissed.

**[1] JUDGMENT** ⚖️ 185.1(3)
228k185.1(3)
Vice president and secretary of out-of-state hotel corporation was competent to testify by affidavit as to facts regarding the corporation's contacts with state, for purposes of defeating personal jurisdiction on motion for summary judgment, without showing affirmatively how he obtained personal knowledge of such facts, where he stated that he had personal knowledge of the facts set forth in his affidavit and of the facts set forth in plaintiff's petition.

**[2] AFFIDAVITS** ⚖️ 9
21k9
An affidavit must set forth facts and show affirmatively how the affiant obtained personal knowledge of those facts.

**[3] WITNESSES** ⚖️ 37(2)
410k37(2)

A corporate officer may testify that information concerning the corporation's contacts with a given state is within his personal knowledge without showing with particularity how he acquired that knowledge, for purposes of defeating personal jurisdiction.

**[4] APPEAL AND ERROR** ⚖️ 1010.1(8.1)
30k1010.1(8.1)
The standard of review to determine the appropriateness of the trial court's resolution of the facts regarding personal jurisdiction is an ordinary sufficiency of the evidence review, including all evidence in the record.

**[5] APPEAL AND ERROR** ⚖️ 893(1)
30k893(1)
If a special appearance is based on undisputed or otherwise established facts, an appellate court shall conduct a de novo review of the trial court's order granting a special appearance; however, in applying the jurisdictional formula to a particular case, the facts must be carefully weighed and mechanical application of any test must be avoided.

**[6] APPEAL AND ERROR** ⚖️ 846(5)
30k846(5)
When the trial court does not file findings, all questions of fact are presumed to support the judgment; the Court of Appeals views the trial court's judgment as impliedly finding all the facts necessary to support its judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 296; Rules App.Proc., Rule 28.1.

**[7] APPEAL AND ERROR** ⚖️ 1008.1(1)
30k1008.1(1)
When a complete statement of facts appears in the record, implied findings are not conclusive, and an appellant may challenge the sufficiency of the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 296; Rules App.Proc., Rule 28.1.

**[7] APPEAL AND ERROR** ⚖️ 1010.1(1)
30k1010.1(1)
When a complete statement of facts appears in the record, implied findings are not conclusive, and an appellant may challenge the sufficiency of the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 296; Rules App.Proc., Rule 28.1.

**[8] COURTS** ⚖️ 35
106k35
The plaintiff has the burden to plead a prima facie showing of jurisdiction; that is, the plaintiff has the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00123   Document 6   Filed in TXSD on 03/31/2000   Page 28 of 71

initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the state long arm statute.

**[9] APPEARANCE** ☞19(3)
31k19(3)
A plaintiff's failure to make jurisdictional allegations is not subject to attack by the specially appearing defendant, who still has the burden of negating all bases of personal jurisdiction at the special appearance hearing.

**[10] COURTS** ☞35
106k35
Without jurisdictional allegations by the plaintiff that the defendant has committed any act in the state, the defendant can meet its burden of negating all potential bases of jurisdiction by presenting evidence that it is a nonresident.

**[11] COURTS** ☞35
106k35
Once the defendant has produced credible evidence negating all bases of jurisdiction, the plaintiff bears the ultimate burden to establish that the state court has personal jurisdiction over the defendant as a matter of law.

**[12] APPEAL AND ERROR** ☞893(1)
30k893(1)
On review of challenge to personal jurisdiction, the appellate court reviews the trial court's application of law de novo and fact findings for sufficiency.

**[13] COURTS** ☞12(2.10)
106k12(2.10)
A court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the state long-arm statute are satisfied. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[14] COURTS** ☞12(2.10)
106k12(2.10)
The state long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant as far as the federal constitutional requirements of due process will allow. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[15] CONSTITUTIONAL LAW** ☞305(5)
92k305(5)
Due process permits a state court to exercise personal

jurisdiction over a defendant only if the defendant has some minimum, purposeful contacts with the state, and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[16] COURTS** ☞12(2.10)
106k12(2.10)
A nonresident who purposefully avails himself of the privileges and benefits of conducting business in the state must answer to suit in the state; however, a nonresident will not be subjected to the jurisdiction of state courts based upon mere random, fortuitous, or attenuated contacts.

**[17] COURTS** ☞12(2.10)
106k12(2.10)
"Specific jurisdiction" is established if the defendant's alleged liability arises from or is related to an activity conducted within the state. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.
See publication Words and Phrases for other judicial constructions and definitions.

**[18] COURTS** ☞12(2.5)
106k12(2.5)
Merely releasing into the stream of commerce a product that comes to rest in the state is not sufficient to establish personal jurisdiction. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[19] COURTS** ☞12(2.5)
106k12(2.5)
Single or even occasional acts are not sufficient to support jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated affiliation with the state. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[20] COURTS** ☞12(2.5)
106k12(2.5)
Even when minimum contacts with the forum state are established, the state court cannot exercise personal jurisdiction over the defendant if to do so would offend traditional notions of fairness. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[21] COURTS** ☞12(2.5)
106k12(2.5)

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00123   Document 6   Filed in TXSD on 03/31/2000   Page 29 of 71

"General jurisdiction" is present when a defendant's contacts in the state are so continuous and systematic that the state may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

See publication Words and Phrases for other judicial constructions and definitions.

**[22] COURTS** ☞12(2.5)
106k12(2.5)

General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. U.S.C.A. Const.Amend. 14; V.T.C.A., Civil Practice & Remedies Code § 17.042.

**[23] COURTS** ☞12(2.25)
106k12(2.25)

Allegations that out-of-state resort hotel encouraged local travel industry companies to sell tickets to state residents for events at hotel and advertised in those companies' promotional materials were insufficient to show the continuous and systematic contacts necessary for the exercise of "general jurisdiction" over hotel, in suit by state residents who were injured during event at hotel, in light of testimony from hotel's corporate officer that hotel corporation never filed articles of incorporation in state, had no designated agent for service of process in state, and had no place of business or residence in state.

See publication Words and Phrases for other judicial constructions and definitions.

**[24] APPEAL AND ERROR** ☞961
30k961

By failing to request a continuance to permit further discovery in order to establish personal jurisdiction, plaintiff did not preserve for appeal issue of whether trial court's failure to allow such discovery was error. Vernon's Ann.Texas Rules Civ.Proc., Rule 120a, subd. 3; Rules App.Proc., Rule 33.1.

*406 Ricardo D. Villanueva, Atty. at Law, Joseph L. Segrato, Thornton, Summers, Biechlin, Dunham & Brown, McAllen, Vaughan Waters, Thornton, Summers, Biechlin, Dunham & Brown, Corpus Christi, Bruno Wolfenzon, Wolfenzon & Volk, Las Vegas, NV, for Appellant.

Julian Rodriguez, Jr., Atty. at Law, McAllen, Keith C. Livesay, Livesay & Cowen, Pharr, for Appellee.

Before Justices DORSEY, HINOJOSA, and CHAVEZ.

OPINION

Opinion by Justice DORSEY.

Facts

Lee Castro and Felix Barragan (collectively, "Castro") brought suit against the MGM Grand Hotel ('MGM") for injuries they sustained at MGM's hotel in Las Vegas while attending the June 1997 Holyfield-Tyson fight. MGM is a Nevada corporation whose principle place of business is in Las Vegas, Nevada. MGM contested personal jurisdiction through special appearance. Castro countered that Texas has general jurisdiction over MGM through its continuous and systematic contacts with Texas by advertising in various magazines to lure Texas residents to its hotel and offering promotions and otherwise encouraging companies to sell tickets for events at the hotel to Texas residents. After the trial court denied its special appearance, MGM brought this interlocutory appeal pursuant to Texas Civil Practices and Remedies Code § 51.014(a)(7) (Vernon Supp.1999).

MGM's Evidence

[1] In support of its sworn special appearance, MGM submitted the affidavit of Senior Vice President and Secretary of MGM, Thomas Peterman. This affidavit affirmatively shows Peterman's competence to make an affidavit, and states that he has personal knowledge of the facts set forth in his affidavit and of the facts set forth in plaintiff's petition. He states that all injuries upon which plaintiffs base this suit occurred in Las Vegas. Regarding MGM's connections with Texas, he states that:

(1) MGM is a Nevada corporation with its principal place of business in Las Vegas, Nevada, who does not consent to Texas jurisdiction;

(2) MGM has never filed its articles of incorporation in Texas with the Secretary of State;

(3) MGM has not designated an agent in Texas for service of process;

(4) at the time of the accident, MGM did not own any real or personal property in Texas, did not lease or maintain any office, residence or place of business in Texas, did not own any stock in Texas, did not have any bank accounts in Texas, and has never paid any income or property taxes in Texas.

(5) for a two month period in 1996, MGM held a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00123   Document 6   Filed in TXSD on 03/31/2000   Page 30 of 71

lease of office space in Houston, Texas, but this was a mistake and all MGM's interest was assigned to the proper company as soon as the mistake was discovered.

[2][3] Castro agues that merely identifying his position as vice president of MGM does not sufficiently show how Peterman acquired personal knowledge of the facts in his affidavit, and thus, the faulty affidavit converts the special appearance into a general appearance which has the effect of waiving MGM's ability to *407 complain of the lack of personal jurisdiction. We agree with Castro's assertion that an affidavit must set forth facts and show affirmatively how the affiant obtained personal knowledge of those facts. See Radio Station KSCS v. Jennings, 750 S.W.2d 760, 761-62 (Tex.1988); accord Welch v. Doss Aviation, Inc., 978 S.W.2d 215, 222 (Tex.App.--Amarillo 1998, no pet.); City of Harlingen v. Vega, 951 S.W.2d 25, 29 (Tex.App.-- Corpus Christi 1997, no pet.). However, we are unpersuaded by his argument that the vice president and secretary of a corporation may not testify to the facts contained in Peterman's affidavit. Peterman's affidavit contained essentially two classes of information: facts gleaned from reading plaintiffs' petition, and facts regarding the corporation's contacts with the State of Texas. The facts regarding a corporation's business connections with another state would ordinarily be within the personal knowledge of the senior vice president and secretary of that corporation. We hold that a corporate officer may testify that information concerning the corporation's contacts with a given state is within his personal knowledge without showing with particularity how he acquired that knowledge.

## MGM's Contacts with Texas

Next, Castro argues that MGM's contacts with Texas are sufficient to establish general jurisdiction in that MGM promotes and encourages companies to sell tickets to Texas residents to attract them to fly to Las Vegas and attend events, relies on Texas residents to travel on Southwest Airlines to their hotel, frequently targets Texas residents, consistently sells tickets in Texas and consistently advertises in magazines predominantly directed to Texas consumers. Castro attached to its response the affidavits of both plaintiffs which described how and where their injuries were sustained. Both state that they were injured at the MGM Grand by the unruly crowd during the fight. The affidavits state that both plaintiffs live in Texas, both flew on Continental

Airlines (from Texas) to Las Vegas, and one plaintiff was first treated for his injuries by a doctor in Texas.

Plaintiff also submitted:

(1) two copies of an advertisement to a David Cassidy show at the MGM Grand which they contend was placed in both the October and November 1998 editions of Southwest Airlines Spirit magazine;

(2) a brochure advertising the MGM Grand Hotel which has advertisements for "Scottie's Tours 'N' Travels" and "Britton's Photo & Imaging," both local (Texan) companies, superimposed on the back of the brochure;

(3) a San Antonio ticket agency's logo and address above a MGM logo, address and map of the arena where events are held;

(4) copies of ticket stubs from the Holyfield-Tyson fight held at MGM Grand Garden Arena;

(5) a copy of the plaintiffs' flight itinerary prepared by Travel Experts, a McAllen, Texas company.

## Standard of Review

[4][5] Texas Rule of Civil Procedure 120a allows a defendant to contest personal jurisdiction by filing a special appearance. Tex.R. Civ. P. 120a(1). The trial court determines the special appearance by referring to the pleadings, any stipulations made by and between the parties, any affidavits and attachments filed by the parties, discovery, and any oral testimony. Tex.R. Civ. P. 120a(2). Interlocutory appeal of the grant or denial of a special appearance has only been available since 1997. Tex. Civ. Prac. & Rem.Code § 51.014(a)(7) (Vernon's Supp.1999). Because the issue of personal jurisdiction is a mixed question of law and fact, courts have since grappled with the proper level of deference to accord the trial court's findings. [*408 FN1] This Court recently lined up with the majority of Texas appellate courts in reaffirming its standard for reviewing a trial court's denial of a special appearance:

FN1. Compare Magnolia Gas Co. v. Knight Equipment & Mfg. Corp., 994 S.W.2d 684, 689-90 (Tex.App.--San Antonio 1998, no pet.) (adopting abuse of discretion standard for review of denial of special appearance) with C- Loc Retention Systems, Inc. v. Hendrix, 993 S.W.2d 473, 476 (Tex.App.-- Houston [14 Dist.] 1999, no pet. h.) (adopting factual sufficiency review for fact findings, de novo review of legal conclusions); Hotel Partners v. Craig, 993 S.W.2d 116, 120 (Tex.App.--Dallas 1994, no pet. h.) (same); Mort Keshin & Co., Inc. v. Houston Chronicle Pub. Co., 992 S.W.2d 642, 645

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00123   Document 6   Filed in TXSD on 03/31/2000   Page 31 of 71

(Tex.App.--Houston [14 Dist.] 1999, no pet. h.) (same); Ball v. Bigham, 990 S.W.2d 343, 347 (Tex.App.--Amarillo 1999, no pet. h.) (same); Cadle v. Graubart, 990 S.W.2d 469, 471 (Tex.App.--Beaumont 1999, no pet.) (same); Happy Indus. Corp. v. American Specialties, Inc., 983 S.W.2d 844, 847 (Tex.App.--Corpus Christi 1998, no pet.) (same); Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 802 (Tex.App.--Houston [1st Dist.] 1998, pet denied).

The standard of review to determine the appropriateness of the trial court's resolution of those facts is an ordinary sufficiency of the evidence review.... The scope of that review includes all evidence in the record.... If a special appearance is based on undisputed or otherwise established facts an appellate court shall conduct a de novo review of the trial court's order granting a special appearance. [However,] in applying the jurisdictional formula to a particular case, the facts must be carefully weighed and mechanical application of any test ... must be avoided.
Happy, 983 S.W.2d at 847 (internal citations and quotations omitted).

[6][7] When a special appearance is denied by the trial court, the defendant may request fact findings. Tex.R. Civ. P. 296; Tex.R.App. P. 28.1. However, when, as here, the trial court does not file findings, all questions of fact are presumed to support the judgment. Accord Hawsey v. Louisiana Dep't of Soc. Servs., 934 S.W.2d 723, 725 (Tex.App.--Houston [1st Dist.] 1996, writ denied). That is, we view the trial court's judgment as impliedly finding all the facts necessary to support its judgment. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex.1990). Where a complete statement of facts appears in the record, however, these implied findings are not conclusive and an appellant may challenge the sufficiency of the evidence. Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex.1989). In this instance, the implied findings are subject to a challenge to factual sufficiency. Id.

[8][9][10][11][12] We find a more concise statement of the respective burdens and standard of review helpful. First, the plaintiff has the burden to plead a prima facie showing of jurisdiction. [FN2] To sustain a special appearance, the nonresident defendant bears the burden of negating all bases of personal jurisdiction. C.S.R. Ltd. v. Link, 925 S.W.2d 591, 596 (Tex.1996). Once the defendant has produced credible evidence negating all bases of jurisdiction, the plaintiff bears the ultimate burden to establish that the Texas court has personal jurisdiction over the

defendant as a matter of law. The appellate court reviews the trial court's application of law de novo and fact findings for sufficiency.

> FN2. That is, the plaintiff had the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long arm statute. Hotel Partners v. KPMG Peat Marwick, 847 S.W.2d 630, 633-34 (Tex.App.--Dallas 1993, writ denied). Still, a plaintiff's failure to make jurisdictional allegations is not subject to attack by the specially appearing defendant, who still has the burden of negating all bases of personal jurisdiction at the special appearance hearing. Id. Without jurisdictional allegations by the plaintiff that the defendant has committed any act in Texas, the defendant can meet its burden of negating all potential bases of jurisdiction by presenting evidence that it is a nonresident. Id.

In this case, because the trial court must have relied on plaintiff's evidence to determine it had jurisdiction, we will presume that all evidence offered by the plaintiff is *409 what it purports to be. Thus, the inferences drawn from Castro's evidence are that MGM has (1) advertised in Southwest Airlines magazine, (2) sold tickets, through Texas agents, to events at the hotel, and (3) contracted with local companies to share costs of advertising. We will also assume that MGM relies, to some extent, on the patronage of Texas residents. Because we have a complete record from the trial court and because plaintiffs did not dispute the substance of MGM's evidence regarding its Texas connections, we will also consider Peterman's affidavit.

Personal Jurisdiction Over MGM

[13][14] A court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Texas long-arm statute are satisfied. CSR, Ltd., 925 S.W.2d at 594. See Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997); Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 413-14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant "as far as the federal constitutional requirements of due process will allow." CSR, 925 S.W.2d at 594. Thus, the question of whether the defendant is within the Texas long arm statute typically merges with the issue of whether personal jurisdiction is consistent with federal standards. Id.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00123   Document 6   Filed in TXSD on 03/31/2000   Page 32 of 71

[15][16] Due process permits a state court to exercise personal jurisdiction over a defendant only if the defendant has some minimum, purposeful contacts with the state, and the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. Dawson- Austin v. Austin, 968 S.W.2d 319, 326 (Tex.1998); CMMC v. Salinas, 929 S.W.2d 435, 437 (Tex.1996); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A nonresident who purposefully avails himself of the privileges and benefits of conducting business in Texas must answer to a suit in Texas. CSR, 925 S.W.2d at 594. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S.Ct. 2174, 2183-84, 85 L.Ed.2d 528 (1985). However, a nonresident will not be subjected to the jurisdiction of Texas courts based upon mere random, fortuitous, or attenuated contacts. CSR, 925 S.W.2d at 595; Burger King, 471 U.S. at 475-76, 105 S.Ct. 2174.

[17][18][19][20] A nonresident's contacts with a state can give rise to either general or specific jurisdiction. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the state. CSR, 925 S.W.2d at 595. Merely releasing into the stream of commerce a product that comes to rest in Texas is not sufficient to establish jurisdiction. Happy, 983 S.W.2d at 847. Rather, the Texas Supreme Court has stated that the act must be purposefully directed at Texas so that the defendant could foresee being haled into court here. Id. Single or even occasional acts are not sufficient to support jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated affiliation with the state. Id. "For example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State would be required to hold a manufacturer answerable to suit in a foreign state." CMMC v. Salinas, 929 S.W.2d at 438. And even when minimum contacts with the forum state are established, the state court cannot exercise personal jurisdiction over the defendant if to do so would offend traditional notions of fairness. Id.

[21][22] On the other hand general jurisdiction is present when a defendant's contacts in the state are so continuous and systematic that the state may exercise personal *410 jurisdiction over the defendant even if the cause of action did not arise from or relate to

activities conducted within the forum state. CSR, 925 S.W.2d at 595; Happy, 983 S.W.2d at 847. General jurisdiction requires a showing the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. CSR, 925 S.W.2d at 595; Happy, 983 S.W.2d at 847.

State's Jurisdiction over Out-of-State Resorts

[23] While Texas courts have had little, if any, opportunity to assess personal jurisdiction over out-of-state resorts, other jurisdictions have developed standards for analyzing this issue. Traditionally, personal jurisdiction has depended upon the resort business's physical presence in the forum. Judge Thomas A. Dickerson, The Internet, the Solicitation Plus Doctrine and Jurisdiction over Foreign Hotels and Other Travel Supplier s, in SECOND ANN. CONF. ON INT'L. TRAVEL & TOURISM: LAW, MANAGEMENT REGULATION 1999 (790 PLI Com. Law & Prac. Course Handbook Series 735) (April 1999) (hereinafter Solicitation Plus ).

> For example, if a foreign hotel or air carrier conducted business through a wholly owned subsidiary or joint venturer or maintained an office with a staff, a bank account and a local telephone number then jurisdiction would, generally, be appropriate. The rationale being that in return for the privilege of doing business in the forum a foreign travel supplier or tour operator should be available to answer claims brought by injured travelers. In the absence of physical presence, however, the assertion of personal jurisdiction is more problematical. For example, instead of maintaining an office in the forum a foreign travel supplier may conduct business through an agent independent contractor, travel agent or tour operator. Under these circumstances personal jurisdiction has been found if there was active solicitation of business plus contract formation in the forum. This concept, known as the "solicitation- plus" doctrine, is still followed by most U.S. Courts.

Solicitation Plus at 738-39. The solicitation-plus doctrine holds that determination of whether jurisdiction is appropriate should balance the extent to which a defendant purposefully avails itself of the privilege of conducting business in the forum state and requires that the claim arises out the defendant's forum related activities and that the exercise of jurisdiction is reasonable. Id. "Reasonableness" depends on (1) the extent of purposeful interjection, (2) the burden on defendant to defend in the chosen

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

ChillPDF - www.fatpdf.com

forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in the dispute, (5) the most efficient forum for judicial resolution of the dispute, (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternate forum. Id.

In Lane v. Vacation Charters, Ltd., the New York court explained that the solicitation-plus doctrine requires that the plaintiff present evidence of some business activity conducted within the forum state by an agent or representative of the out-of-state defendant. 750 F.Supp. 120, 124 (S.D.N.Y.1990). The court noted that under the solicitation-plus rule, no matter how substantial the revenues generated by a nonresident business's advertising in the state, mere advertising and solicitation of orders are insufficient to warrant jurisdiction. Id. Rather, the doctrine requires out-of-state solicitation "plus" some financial or commercial dealings with the forum state, or holding himself out as operating in the forum state either personally or through an agent. Id. In the instant case, plaintiffs have presented no evidence that MGM did anything more than solicit business and advertise in Texas.

Other courts uniformly require something more than merely soliciting business *411 from another state to justify imposition of personal jurisdiction. See id.; Afflerbach v. Cunard Line, Ltd., 14 F.Supp.2d 1260 (D.Wyo.1998) (holding Wyoming did not have personal jurisdiction over out- of-state cruise ship company even though it solicited business through national advertising and sold tours through Wyoming travel agents); Lane, 750 F.Supp. 120 (S.D.N.Y.1990) (holding that New York court did not have personal jurisdiction over Pennsylvania ski resort even where evidence showed that resort targeted New York residents, maintained an 800 number for New York residents, sent brochures to New York travel agents upon request and regularly sent employees to New York trade shows); Fields v. Ramada Inn, 816 F.Supp. 1033 (E.D.Pa.1993) (holding that Pennsylvania had insufficient contact with North Carolina hotel to establish personal jurisdiction where Pennsylvania resident drowned in hotel pool even though hotel maintained 800 number for out- of-state hotel reservations, plaintiffs made their reservations through a Pennsylvania travel agent, and the hotel advertised nationally); Clark v. City of St. Augustine, Florida, 977 F.Supp. 541 (D.Mass.1997) (advertising in Boston Globe and sending brochure to Boston travel agencies that were distributed to the plaintiffs and induced plaintiffs to travel to city held insufficient to confer personal jurisdiction in Massachusetts over Florida city where tourist from Boston was injured). A continuous and systematic pattern of advertising in a foreign state through in-state and national media, in addition to other in-state promotional activities aimed at enticing the state's residents to attend an out of state facility, has been found sufficient minimum contacts to confer personal jurisdiction. Pedelahore v. Astropark, Inc., 745 F.2d 346 (5th Cir.1985); Kervin v. Red River Ski Area, Inc., 711 F.Supp. 1383 (E.D.Tex.1989).

Those cases holding an out-of-state resort subject to personal jurisdiction of the forum state's court have found a substantial link from the resort to the forum state. For example, in Gavigan v. Walt Disney World, 646 F.Supp. 786 (E.D.Pa.1986), the Pennsylvania court found that it had personal jurisdiction over Walt Disney World for an accident that occurred at Walt Disney in Florida because the evidence showed that Walt Disney had conducted an extensive marketing campaign directed specifically at Philadelphia residents. Again, we note that Castro has produced no such evidence. Also, Castro has offered no evidence showing that MGM either specifically targets Texas or Rio Grande Valley residents, relies significantly upon this market for revenues, or maintains any agent or representative there. Cf. Lane, 750 F.Supp. at 122.

The Fifth Circuit recently decided a case that is illustrative, Gardemal v. Westin Hotel Company, 186 F.3d 588, 591-92 (5th Cir.1999). In that case, Lisa Gardemal sued Westin Hotel Company and Westin Mexico, S.A. de C.V. in Texas federal district court under Texas law, alleging that the defendants were liable for the drowning death of her husband in Cabo San Lucas, Mexico. Id. Gardemal and her husband had traveled to Cabo San Lucas to attend a medical seminar held at the Westin resort hotel there. Id. Her husband drowned while snorkeling near the hotel. Id. Westin moved to dismiss the suit alleging that there were insufficient minimum contacts to bring it within the personal jurisdiction of the court. Id.

Gardemal argued that the district court had specific jurisdiction over Westin Mexico because her husband decided to attend the seminar after reading a Westin brochure that was distributed to him in Texas. Id. at 595-96. The Fifth Circuit court did not find this sufficient. Id. It noted that the medical seminar at Cabo San Lucas was arranged and promoted by Smith & Nephew Richards, Inc., a supplier of orthopedic

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

hardware, and that the Gardemals obtained the brochure from this company along with the registration materials for the seminar. Id. There was no specific evidence that Westin was involved in promoting **412** the seminar or soliciting the Gardemals. Id.On those grounds, the court found no basis for the exercise of specific jurisdiction over Westin Mexico. Id.

Gardemal also argued that the court had general jurisdiction over Westin Mexico, contending that it advertised in several Texas newspapers and magazines and contracted with numerous Texas businesses like American Airlines, Continental Airlines, and various wholesalers in the travel industry. Id. The court found that Gardemal had shown no evidence regarding how frequently Westin ran ads in Texas newspapers and magazines, how much business the ads generated, nor any proof of the specific relationship between Westin Mexico and the Texas tourist companies, nor the amount of business these companies have generated for Westin Mexico. Id.Accordingly, the court found no basis for exercise of general jurisdiction either. Id.

We find the reasoning in Gardemal persuasive. As in Gardemal, Castro's assertions are vague, overly general, and give no indication of the extent, duration, or frequency of MGM's business dealings in Texas. Even when taken as true, Castro's assertions amount to little more than a vague claim that MGM conducts business in Texas. MGM's corporate officer testified that MGM has never filed its articles of incorporation in Texas with the Secretary of State, has not designated an agent in Texas for service of process, did not own any real or personal property in Texas, lease or maintain any office, residence or place of business in Texas, nor own any stock or have any bank accounts in Texas, and has never paid any income or property taxes in Texas. On these facts, we cannot conclude that MGM has the type of continuous and systematic contacts necessary for the exercise of general jurisdiction.

[24] We note that Rule 120a allows the court to order a continuance to permit further discovery or make any other order as is just to allow the plaintiff to garner his evidence establishing personal jurisdiction. See Tex.R. Civ. P. 120a (3). Like most other rights, in order to complain on appeal of a trial court's failure to allow further discovery to obtain evidence on minimum contacts, the plaintiff must request it from the trial court. See Tex.R.App. P. 33.1. In this case, plaintiff made no request, and thus waived the issue. Id. Accordingly, we overrule the trial court's finding of personal jurisdiction over MGM and reverse its denial of special appearance. We therefore dismiss this case for lack of personal jurisdiction over the defendant.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

# 2311933 - LUMPKIN,GWYNN

| | | |
|---|---|---|
| Date and Time Printing Started: | 03/31/2000 | 02:53:24 pm (Central) |
| Date and Time Printing Ended: | 03/31/2000 | 02:53:31 pm (Central) |
| Offline Transmission Time: | | 00:00:07 |
| Number of Requests in Group: | 1 | |
| Number of Documents Charged: | 1 | |
| Number of Lines Charged: | 0 | |

*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*END*

C

CutePDF — www.bevisa.com

Opinion issued March 30, 2000



In The

# Court of Appeals
For The
# First District of Texas

_____

### NO. 01-99-00502-CV
_____

PREUSSAG AKTIENGESELLSCHAFT, Appellant

V.

MARSHALL COLEMAN, ET AL., Appellees[1]

**On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Cause No. 94-C-1392**

## O P I N I O N

Preussag Aktiengesellschaft ("Preussag AG") takes this interlocutory appeal from an

_____

[1]     A complete list of all appellees appears on pages i through xxvi of appellant's brief.

order denying its special appearance. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon Supp. 2000). The issue in this appeal is whether a German holding corporation, whose relations with its indirect[2] Texas subsidiaries are virtually its sole Texas contacts, must defend, in a Brazoria County court, a cause of action based on its sales of products to Iraq, when those products were allegedly converted to weapons and later used against American soldiers. We answer this question in the negative. Therefore, we reverse and remand with instructions to dismiss Preussag AG for lack of personal jurisdiction.

## I. Factual and Procedural Background

Appellees are veterans of the 1991 Persian Gulf War and some of their family members. Of the nearly 1800 plaintiffs in this case, approximately 185 are Texas residents. Appellees allege they were exposed to biological and chemical materials in Iraq or Kuwait during the war, resulting in physical and emotional injuries. Appellees maintain that the over 80 defendants, one of which is Preussag AG, sold Iraq the biological, chemical, and other materials that it then used in weapons.

In June 1994, appellees sued the defendants in Brazoria County, Texas, on theories of negligence and product liability. Preussag AG was not yet a defendant. The defendants removed the case to the federal court, where Preussag AG was added as a defendant. Preussag AG moved to dismiss for lack of personal jurisdiction, but Judge Kent dismissed the entire

---

[2] By "indirect subsidiaries," we mean those in which Preussag AG does not directly hold stock, but in which it has a financial interest by virtue of holding stock in another company that, in turn, holds stock in the Texas subsidiary.

2

case for lack of subject-matter jurisdiction. *Coleman v. Alcolac*, No. G-94-415, slip op. at 31 (S. D. Tex. June 6, 1995) (order granting motion to dismiss for lack of subject-matter jurisdiction and remanding cause to state court).

On remand, Preussag AG specially appeared. The trial judge denied Preussag AG's special appearance without filing fact findings or legal conclusions. Preussag AG appeals.

## II. Standard of Review and Burden of Proof

We review all evidence to determine if Preussag AG negated all possible grounds for personal jurisdiction. *Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Existence of personal jurisdiction is a question of law, but that determination must sometimes be preceded by the resolution of underlying factual disputes. *James v. Illinois Cent. R.R.*, 965 S.W.2d 594, 596 (Tex. App.—Houston [1st Dist.] 1998, no pet.). When, as here, the trial judge files no fact findings, we presume all factual disputes were resolved to support the judge's decision. *Garner*, 966 S.W.2d at 802. While we generally review for factual sufficiency, we review de novo if the underlying facts are undisputed or otherwise established. *C-Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

## III. Jurisdictional Test

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause[3] and the Texas long-arm

---

[3]     U.S. CONST. amend. XIV, § 1.

statute[4] are satisfied. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996) (orig. proceeding). Because the Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow," the statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *Id.*

Federal due process requirements are two-fold. First, the nonresident defendant must have purposefully established such minimum contacts with the forum state that it could reasonably anticipate being sued there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76; 105 S. Ct. 2174, 2183-84 (1985). If the nonresident defendant has purposefully availed itself of the privileges and benefits of conducting business in a state, it has sufficient contacts to confer personal jurisdiction. *Id.* Random, fortuitous, or attenuated contacts do not suffice. *Id.* It is the quality and nature of the contacts, rather than their number, that is important. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.D.*, 815 S.W.2d 223, 230 n. 11 (Tex. 1991). Minimum contacts are particularly important when the defendant is a foreign national because of the unique and onerous burden of defending a suit in a foreign legal system. *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114; 107 S. Ct. 1026, 1033 (1987); *CSR, Ltd.*, 925 S.W.2d at 595.

Minimum contacts analysis is further divided into general and specific personal jurisdiction. *CSR, Ltd.*, 925 S.W.2d at 595. Appellees concede that this is a case of general personal jurisdiction, which requires Preussag AG to show its contacts in Texas were not

---

[4]      TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 1997).

continuous and systematic. *Id.* To support a finding of general jurisdiction, the defendant's

forum activities must have been "substantial," which requires stronger evidence of contacts

than for specific personal jurisdiction.[5] *Id.*

Second, if the nonresident defendant has purposefully established minimum contacts

with the forum, the exercise of jurisdiction must comport with fair play and substantial justice.

*Burger King Corp.*, 471 U.S. at 475-76; 105 S. Ct. at 2183-84; *Guardian Royal*, 815 S.W.2d

at 228.

### IV.  Jurisdictional Facts

The following evidence was developed at the special appearance hearing.  Preussag AG

is a publicly traded German corporation headquartered in Hanover, Germany.  It is an

investment holding company, with direct and indirect investments in 500 to 600 subsidiaries

worldwide.  It does not manufacture anything.  It is not authorized by the state government of

Texas to do business in Texas, and it does not manufacture or sell products, have an office,

keep business records, solicit business, own real property, or have an agent for service of

process in Texas.  Preussag AG did not enter into contracts in Texas for the products it sold

to Iraq, and the sales of these products took place entirely outside Texas.

### A.       Preussag AG's Six Indirect Subsidiaries in Texas

Preussag AG does, however, own indirect interests in six companies that do business

---

[5]     Specific personal jurisdiction exists if the defendant's alleged liability arises from or
is related to an activity conducted within the forum.  *CSR, Ltd. v. Link*, 925 S.W.2d
591, 595 (Tex. 1996).

in Texas: (1) Delta Steel, Inc. ("Delta"), (2) Cron Chemical Corporation ("Cron"), (3) Deutag

Marketing and Technical Services, Inc. ("DMTS"), (4) PB-KBB Inc., Houston ("PB-KBB"),

(5) Pipetronix, Houston ("Pipetronix"), and (6) Triple D Supply Corporation Dallas ("Triple

D"). Like many of Preussag AG's worldwide subsidiaries, the indirect Texas subsidiaries are

part of what the parties call the "Preussag Group" of companies. Appellees allege that

Preussag AG's contacts with these six Texas subsidiaries make it amenable to suit in Texas.

Therefore, we discuss these indirect six Texas subsidiaries further below.

**B.     The Subsidiaries that were Sued**

Besides Preussag AG, appellees also sued five direct or indirect subsidiaries of

Preussag AG:  (1) Deutshe Tiefbohr AG ("Deutag"); (2) Preussag Handel; (3) Preussag North

America ("PNA"), formerly Preussag Industrial Corporation ("PIC"); (4) Preussag Stahl AG

("Stahl"); and (5) Preussag Anlagenbau GmbH ("Anlagenbau"), the only directly owned

subsidiary.  Although these five subsidiaries were not Texas corporations, they did not contest

personal jurisdiction.

Appellees' "live" petition at the time of the hearing alleged that Preussag AG and these

five subsidiaries were alter egos of each other for liability purposes, but appellees now admit

that these five subsidiaries "are not the foundation of the jurisdictional finding" in this case,

through alter ego or agency theory or otherwise.  Therefore, we discuss them only insofar as

they relate to the six indirect Texas subsidiaries on which appellees' jurisdictional argument

rests.

6

## C.   Preussag AG's Relevant Operational Scheme

Following are what the parties identify as the relevant aspects of the Preussag Group's operational scheme. This operational scheme applies to at least some of the six indirect Texas subsidiaries.

German law requires Preussag AG to publish an annual, consolidated financial statement including the financial information of any subsidiary in which it owns a 50 percent minimum interest. To comply, Preussag AG periodically requests financial information from its subsidiaries. This is sometimes accomplished by the subsidiaries' reporting their information to another Preussag Group company, which then forwards it to Preussag AG; other times, the subsidiaries report directly to Preussag AG.

To prepare these financial reports, some Preussag Group companies, including at least some of the six indirect Texas subsidiaries, use Preussag AG's "Greenbook," which uses standard German accounting procedures. Preussag AG keeps all the reported data in a computer database; therefore, Preussag Group companies receive Preussag AG's Holding Management Handbook on how to enter this data.

Preussag AG has extended lines of credit, made on commercially reasonable terms and at market-rate interest, to some of the Preussag Group companies. It also has certain cash-management procedures for group companies. For example, to facilitate foreign-currency payments by some of its German subsidiaries, Preussag AG has foreign currency accounts through which it makes payments on their behalf. The Preussag Group companies are expected to use these accounts for such payments.

7

Preussag AG also provides "banking" services to some Preussag Group companies to facilitate intercompany dividend payments, loan repayments, or payments for services and products sold between group companies. These "banking" services are more akin to a debit/credit or clearing-account system. For example, on the subsidiaries' instructions, Preussag AG debits or credits their accounts monthly, depending upon which company bought and which sold goods or services that month. The participating Preussag Group companies also receive a monthly report, like a checking account statement, reflecting the month's debits, credits, and current balance. As part of this system, the participating Preussag Group companies may open new bank accounts only with the approval of Preussag AG's financial department, and excess funds from the participants' bank accounts are transferred daily to Preussag AG. This is not an accounting system, as each subsidiary maintains its own accounting system.

Each Preussag Group subsidiary has its own primary insurance, but Preussag AG's excess liability policy also covers its subsidiaries in which it holds a 50 percent minimum interest. At one time, Preussag AG studied the feasibility of consolidating the total employee benefit package for the Preussag Group's U.S. subsidiaries. A memorandum shows that Preussag AG representatives attended two meetings in 1992 or 1993, one in Florida and the other in Illinois, for this purpose.

Preussag AG sometimes provides administrative assistance to the Preussag Group companies at the companies' cost, *e.g.*, insurance brokerage services, computer support, and project financing for some of the Preussag Group companies' customers.

8

**D.     Specific Preussag AG Contacts with the Six Indirect Subsidiaries in Texas**

In addition to the contacts under the Preussag Group's general operational scheme, appellees argue the following contacts between Preussag AG and its six indirect Texas subsidiaries show personal jurisdiction.

### 1.     Delta

Delta is a Texas corporation providing general warehousing, offering value-added processing, and producing plates, coil, and tubing. It is owned 55 percent by PNA, which is owned 100 percent by Salzgitter Huttenwork GmbH, which in turn is owned 100 percent by Preussag AG. Delta buys some steel products from, is managed by, and reports to Preussag Handel, which is 100 percent owned by Preussag Stahl, which in turn is owned 99.5 percent (directly or indirectly) by Preussag AG.

Pursuant to Preussag Handel's regulations, Delta submits capital expenditure requests over $40,000 to Preussag Handel for its approval; Preussag Handel in turn submits the requests for Preussag AG's approval. Delta has also provided Preussag AG with proposed capital budgets for approval and comment. Using the Greenbook, Delta reports its financial and related information regularly to Preussag Handel, which sends it to Preussag AG for the annual, consolidated financial statement required by German law. Preussag AG has apparently also transferred funds to Preussag Handel's account on Delta's behalf, under the Preussag Group cash-management system discussed above, to pay for sales from Preussag Handel to Delta.

9

CVisPDF - www.texia.com

Appellees also point to the following direct contacts between Preussag AG and Delta. The record contains copies of 11 letters between the two companies from 1993 through 1995. One is a letter asking Delta for a copy of a rent contract and an explanation why certain Delta executives' salaries had increased, although Delta's president testified that Preussag AG's approval was not needed for salary expenditures. Some others concern the reporting for Delta that Preussag AG must compile. Delta's phone records also reflect it made about 35 calls over several years to Hanover, where Preussag AG is headquartered. In 1994, Preussag AG's new board chairman once met in Boston with officers of all U.S. Preussag Group subsidiaries, including Delta's president, to discuss their products, expectations, and performance and the chairman's global philosophy. The only other meeting between Delta and Preussag AG representatives was in 1995, when someone from Preussag AG's corporate development department came to Houston while "visiting various companies to see their operations." Preussag AG once wrote what Delta's president described as a "comfort letter" that could be used in support of loans that Delta's parent company, PIC (now PNA), would take out on Delta's behalf. The letter said Preussag AG would use its influence on PIC to ensure PIC met any obligations under the credit agreements PIC executed for Delta's benefit. We have found no evidence that this comfort letter was written for or sent to Texas banks, and Delta's president testified PIC's lenders at the time were not in Texas. Finally, every few years and at its own expense, Preussag AG sent either its own auditors or those of Price Waterhouse to

10

audit Delta.[6]

## 2.    Triple D

Triple D is a Texas corporation that supplies drilling equipment mainly to a Preussag Group drilling company. Triple D is owned by Deutag Friesland BV, which is owned by Deutag. The evidence conflicts whether Preussag AG owns Duetag directly, or whether Deutag is 100 percent owned by Preussag Energie GmbH, which Preussag AG did not fully acquire until 1991. Under its cash-management system described above, Preussag AG has transferred funds to Triple D's Houston bank account on Deutag's behalf, to pay for sales from Triple D to Deutag.

Triple D's audits are sent to Preussag AG's auditors. Triple D now reports its financial information to Deutag, but for a few years during the 1980s, it reported to Preussag AG directly using the Greenbook.

## 3.    PB-KBB

PB-KBB, a Delaware corporation with a Houston office, specializes in subsurface systems and technology. PB-KBB is owned half by a Preussag Group company (KBB) and half by a company outside the Preussag Group. Preussag AG has extended lines of credit to PB-KBB at market-rate interest. Some of these loans were deposited into PB-KBB's Texas bank account. The record contains several faxes and memoranda of phone conversations discussing

---

[6]    Appellees correctly note that PNA (formerly PIC) extended Delta a $30 million open line of credit. However, this fact does not concern *Preussag AG's* actions, as appellees disavow any attempt to pierce the corporate veil between Preussag AG and PNA.

11

CAMPDF - www.fenrisi.com

potential or actual loans from Preussag AG to PB-KBB from 1987 to 1992.  There was

contrary testimony from PB-KBB's vice-president of finance that PB-KBB did not borrow

from Preussag AG, but we presume the judge found it did, as there were no fact findings to

settle this conflicting evidence.  The record also shows that PB-KBB sometimes requested to

borrow or got loans from (1) Preussag Finance BV, (2) an undefined "Preussag," and (3) PIC

(now PNA), as well.  Preussag AG once sent its own auditors, and another time sent those of

Price Waterhouse, to audit PB-KBB.

**4.    Pipetronix**

Pipetronix is a Texas corporation that offers pipeline inspections and cleaning services

in the U.S. mainly for Pipetronix GmbH.  Pipetronix became part of the Preussag Group in

1991 and is a wholly owned subsidiary of PNA, a corporation headquartered in Chicago that

is the holding company for most of the Preussag Group's U.S. companies.  Pipetronix's phone

records show it called Germany very often over several years.  A Pipetronix officer testified

many calls were likely to Pipetronix GmbH, located in Karlsruhe, Germany, because the two

companies frequently spoke by phone, but it appears that roughly a third were to Hanover,

where both Preussag AG and Anlagenbau were headquartered in the same building.  Because

Anlagenbau is the parent of Pipetronix GmbH, for which Pipetronix provides services, the

same Pipetronix officer speculated that his office might have sometimes called Anlagenbau,

but Preussag AG did not show how many of the calls to Hanover were to it or to Anlagenbau.

Using the Greenbook, Pipetronix provides its financial reports to PNA, which forwards them

to Preussag AG.  Finally, to show Preussag AG's "pervasive" control over Pipetronix, appellees

12

CutePDF - www.tanita.com

rely on the following testimony of a Pipetronix officer, explaining how he had heard of Preussag AG:

> I suppose daily in conversation—not daily, but in conversation around the office, obviously there's reference to who Preussag [AG] is, but not ever in any relationship as to any reporting to them or anything. . . . I think it's more an identity thing, as far as we're concerned, in that Preussag [AG] is the big mother in the sky up there somewhere, you know, and I think we can all identify that we are a part of the Preussag AG companies, but other than that, no relationship at all.[7]

### 5.   DMTS

DMTS has offices in Houston and is owned by Deutag.  Deutag and DMTS, which markets drilling services, conduct drilling business in the U.S.  A deposit slip indicates that Preussag AG paid some of DMTS's invoices to Deutag, depositing funds into DMTS's Texas bank account.

### 6.   Cron

Cron is a Texas company that is owned by Amalgamet, Inc.  Using the Greenbook, Cron reports its financial and operations information to Amalgamet's London office, which sends the information to Preussag AG for the annual, consolidated financial statement required by German law.  Deloitte & Touche prepares Cron's year-end account for Preussag AG.

### E.   Other Actions by Preussag AG

---

[7] Appellees' brief correctly states that PNA extended Pipetronix a line of credit. However, this fact does not concern *Preussag AG's* actions, as appellees disavow any attempt to pierce the corporate veil between Preussag AG and PNA.

13

CUtePDF - www.texis.com

### 1.    Contracts

In 1986, Preussag AG sold its stock in Preussag Oil & Gas back to the corporation.  The

agreement recites it is "governed by the laws of the State of Texas."

In 1992, PB-KBB merged into Preussag Oil & Gas.  The agreement recited that these

two companies had approved the merger "pursuant to the Texas Business Corporation Act."

Preussag AG also signed the agreement, but solely as indemnitor for pre-merger

environmental liability of Preussag Oil & Gas, its former indirect subsidiary.  The agreement

was to be "governed by, and construed in accordance with, the laws of the State of Texas."

### 2.    Texas Attorneys

From about 1986, Vinson & Elkins's Houston office performed various services for

Preussag AG or its subsidiaries.  For example, the two contracts discussed above were possibly

executed with the firm's assistance, as copies of the agreements were in its records.

Appellees first point to around 27 invoices for the firm's services from 1986 to 1993,

some including fairly substantial fees.  Some invoices were billed to Preussag Oil & Gas's

account, but most were billed to that of "Preussag AG," showing a Houston address.  However,

it appears the vast majority of these invoices were mailed to *Preussag Oil & Gas* in Houston,

not Preussag AG, or were for services that could have been rendered only for the former.  The

record also contains a 1990 phone message instructing that invoices should be billed to the

account of "Preussag Oil & Gas," not "Preussag AG."  Nevertheless, because there are no fact

findings, we must presume the trial judge found that at least the few invoices that (1) were not

mailed to Preussag Oil & Gas or (2) did not itemize services that could have been performed

14

only for Preussag Oil & Gas were for the firm's work for Preussag AG.

Appellees also point to about 16 items of correspondence between Preussag AG and the firm from 1993 to 1996. Some of these referenced travel plans or meetings, a few were personal, and others concerned an attorney's service on PNA's board after this lawsuit was filed. In 1996, Preussag AG agreed to hold that attorney harmless from liability he might incur as a PNA board member.

## V. Discussion

Because the Texas long-arm statute reaches as far as federal due process allows, we need examine only whether the exercise of personal jurisdiction over Preussag AG comports with federal due process. *See CSR, Ltd.*, 925 S.W.2d at 595.

Appellees argue that Preussag AG is subject to Texas's general jurisdiction because Preussag AG (1) has a close business relationship with its six indirect Texas subsidiaries, (2) once wrote a comfort letter on one's behalf, (3) twice contracted with Texas entities, and (4) employed a Houston law firm. Under these facts, we disagree.

## A. Preussag AG's Relationship with its Six Indirect Texas Subsidiaries

Appellees disavow any alter ego[8] or agency theory of personal jurisdiction, *i.e.*, they do not attempt to impute the six indirect Texas subsidiaries' activities to Preussag AG. Rather,

---

[8]   The alter ego theory generally allows one corporation's actions to be ascribed to another by disregarding their distinct corporate entities. *See, e.g., Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984) (corporate form normally not disregarded absent its use for fraudulent purposes, to avoid liability, or under like exceptional circumstance).

15

they focus on Preussag AG's normal, corporate actions within the Preussag Group system—such as occasional audits; unified financial procedures for the annual reporting required by German law; a unified "banking" system, involving loans and intercompany payments and requiring some deposits into the subsidiaries' Texas bank accounts; parent approval of large expenditures and budgets; consideration of adopting a group benefits system; and the communications and visits that accompany these activities—directed at these six indirect Texas subsidiaries.

### 1. Texas and Fifth Circuit Case Law: Personal Jurisdiction over Nonresident Parent Corporation

In support, appellees rely on four Texas or Fifth Circuit cases for the proposition that a "close business relationship" between a foreign parent company and its Texas subsidiary can justify subjecting the parent to Texas jurisdiction. *See Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 418 (Tex. App.—Houston [14th Dist.] 1997, no writ) (plurality opinion); *3-D Elec. Co. v. Barnett Constr. Co.*, 706 S.W.2d 135, 139 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) (Texas); *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978) (Texas). However, the court in each of these cases was performing an alter ego analysis to pierce the veil between parent and subsidiary:[9]

> Arguing that ContiCarriers is the "alter ego" of its parent company, Continental Grain, the Conners contend that Continental Grain's Texas contacts should be

---

[9] Moreover, each court found there was no jurisdiction over the parent corporation under an alter ego theory.

imputed to ContiCarriers. ContiCarriers is the wholly owned subsidiary of Continental Grain, which operates several grain elevators and maintains offices in Texas. *Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state simply because its subsidiary is present or doing business there.* The mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent. *In some circumstances a close relationship between a parent and its subsidiary may justify a finding that the parent "does business" in a jurisdiction through the local activities of its subsidiaries. The rationale for such an exercise of jurisdiction is that the parent corporation exerts such dominance and control over its subsidiary "that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction."* These principles apply not only in the situation where jurisdiction is sought over the parent corporation through its subsidiary's local activities, but also when jurisdiction is sought over the subsidiary through its parent corporation.

*Conner*, 944 S.W.2d at 418 (citations omitted, emphasis added); *accord 3-D Elec.*, 706 S.W.2d at 139 (applying same analysis to determine whether two companies, which were not parent and subsidiary, were each other's alter ego); *Hargrave*, 710 F.2d at 1159 (applying same rule in alter ego analysis); *Walker*, 583 F.2d at 167 (same).[10] These cases do not create

---

[10]  *Accord, see Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 802 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *McFee v. Chevron Int'l Oil Co.*, 753 S.W.2d 469, 471 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Jones v. Beech Aircraft Corp.*, 995 S.W.2d 767, 771-72 (Tex. App.—San Antonio 1999, pet. dism'd); *Alpine View Co. Ltd. v. Atlas Copco AB*, No. 97-20879, slip op. at *8 (5th Cir. Feb. 25, 2000) (op. on remand) (Texas); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492-93 (5th Cir. 1974) (Texas); *Murdock v. Volvo of Am. Corp.*, 403 F. Supp. 55, 56-57 (N.D. Tex. 1975) (Texas). *Cf. Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99-100 (Tex. App.—Houston [14th Dist.] 1995, writ denied) ("Similarly, jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual."); *Solow v. Century Assets Corp.*, No. 09-99-00182-CV, slip op. at 6-7 (Tex. App.—Beaumont Nov. 4, 1999, no pet.) (same); *Stuart v. Spademan*, 772 F.2d 1185, 1196-97 (5th Cir. 1985) (Texas) (same).

17

a rule that, outside an alter ego situation, a parent's normal relationship with its subsidiary, pursuant to an overarching system that is not directed at any particular state, suffices to subject the parent to jurisdiction in its subsidiary's state.

In fact, *Conner* implies the opposite. *See id.*, 944 S.W.2d at 417-19. In *Conner*, it was undisputed that the two corporations maintained "significant ties," including the sharing of headquarters outside Texas; a unified payroll and benefits system; the Texas parent's provision of legal, accounting, and other services to the nonresident subsidiary; and the fact that 50 percent of the subsidiary's revenue came from servicing the parent corporation. *Id.* at 419. The plaintiffs argued both that (1) the nonresident subsidiary had direct contacts with Texas and (2) its Texas parent's actions could be imputed to the nonresident subsidiary under an alter ego theory. *Id.* Nonetheless, in discussing the subsidiary's *direct* contacts with Texas, neither the plaintiffs nor the court considered the nonresident subsidiary's everyday relations (unified benefits and payment systems, intercompany services, profit flow, etc.) with its Texas parent. *See id.* at 417. Rather, they considered these parent-subsidiary contacts only in connection with the *alter ego* analysis. *See id.* at 418-19. Although the case was not decided on this point, we would expect that, if such routine parent-subsidiary contacts were important in determining the nonresident subsidiary's *direct* contacts with Texas, someone in *Conner* would have said so. No one did.

*Bearry v. Beech Aircraft Corporation* is also instructive. 818 F.2d 370 (5th Cir. 1987). In *Beech*, the survivors of two individuals killed in a Beech aircraft in Mississippi sued

18

Beech in Texas on product liability theories. *Id.* at 372. Beech engaged in a nationwide marketing campaign, during which nearly $250 million of its products flowed to 17 independent Texas dealers. *Id.* at 373. Beech representatives occasionally visited the Texas dealers at the dealers' request. *Id.* One of the Texas dealers was a wholly owned subsidiary of another Beech subsidiary. *Id.* Regarding this "indirect" Texas subsidiary, the *Beech* court noted that "because [the indirect subsidiary] is operated as a distinct corporation, the district court properly held that its contacts with Texas could not be imputed to Beech." *Id.* However, the district court had also characterized the independent Texas dealers as "Beech retailers," implicitly attributing their activities to Beech, despite Beech's lack of control over their operations. *Id.* at 375 & n.2 ("Although the district court noted that the activities of the independent dealers could not be attributed to Beech, it found the existence of the distribution system in Texas to establish conduct by Beech within that forum."). The district court had further characterized all aircraft sales to Beech's Texas dealers as occurring in Texas, although all sales were negotiated and completed in Kansas. *Id.* at 375. The Fifth Circuit Court of Appeals rejected these two characterizations:

> But Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them.

*Id.* at 375-76. It further held that "distributors selling Beech manufactured products for their own account do not create minimum contacts sufficient to warrant general jurisdiction over Beech. *Id.* at 376. Beech has no office in Texas, has no agents in Texas, and has no control

19

over the Texas dealers. *Id.* at 377. As such, Beech is not 'doing business' in Texas." *Id.* at 376. We conclude that *Beech* generally supports Preussag AG's position.

*Dalton v. R&W Marine, Inc.* also supports Preussag AG's position. 897 F.2d 1359 (5th Cir. 1990). *Dalton* involved the Louisiana long-arm statute, which, like that of Texas, extended to the limits of due process. *Id.* at 1361. In *Dalton*, the plaintiff sued his employer. *Id.* at 1360. He also sued Hartley Marine Corporation, of which the plaintiff's employer was an unincorporated division, and Midland Enterprises, Hartley's nonresident parent corporation. *Id.* at 1360-61. Midland was a holding company with multiple subsidiaries, including five incorporated under Louisiana law and four licensed to do business there. *Id.* at 1361. Midland had no employees, offices, or property in Louisiana, and it did not conduct business there. *Id.* However, Midland owned most of the vessels its Louisiana subsidiaries used, bareboat chartered [11] the vessels to them (yielding about 12.9 percent of Midland's total revenues), advertised nationally, and sometimes bought vessels at marshals' sales within the state. *Id.*

The plaintiff argued that Midland was subject to Louisiana's general jurisdiction because it (1) had direct contacts with Louisiana and (2) was the alter ego of its subsidiaries. *Id.* In rejecting the first argument (direct contacts), the *Dalton* court held as follows:

> Dalton asserts that Midland bareboat charters its boats to its Louisiana subsidiaries . . ., engages in advertising that reaches Louisiana, and has purchased vessels at marshals' sales within the state. These contacts, however, are not sufficiently systematic and continuous to constitute a general presence in the state. The strongest support for jurisdiction is Midland's bareboat charters,

---

[11]   A bareboat charter vest most incidents of ownership in the charterer operating the vessel. *Id.* at 1362.

which by definition vest most of the incidents of ownership in the charterer operating the vessel. Although Midland's continued ownership of these vessels presents a somewhat more "continuous and systematic" presence in the state than Beech's airplane sales in *Bearry*, like Beech, Midland takes care that these charters are entered into, and payments made pursuant to them are remitted, in Cincinnati. A corporation's "obvious intent to exercise its due process rights" should not be disregarded lightly.[12]

*Id.* at 1362 (internal citations omitted). In short, the direct contact analysis included such things as bareboat chartering contracts with the subsidiaries, but did not include the type of intercorporate activities, such as unified banking and benefit schemes and communications, on which appellees rely to show Preussag AG's general presence in Texas. In contrast, when the *Dalton* court rejected the second argument (alter ego), it considered these contacts:

> Several factors point to Midland as the alter ego of its subsidiaries. Midland owns 100% of its subsidiaries and remains responsible for general policy. Its subsidiaries funnel their revenues into centralized bank accounts and file a consolidated federal tax return with Midland. Finally, Midland offers benefit plans to its subsidiaries' employees. Nonetheless, these factors are outweighed, albeit modestly, by the fact that Midland observes corporate formalities, makes its subsidiaries responsible for daily operations including all personnel decisions, and allows each subsidiary to keep its records and accounts in separate books and file its own state tax return. Having concluded that Midland cannot be considered the alter ego of its subsidiaries, we need not address whether Hartley can be considered the alter ego of Midland.

*Id.* at 1363. *Dalton* indicates that the type of parent-subsidiary contacts appellees rely on to show jurisdiction over Preussag AG—such as unified banking and benefits schemes, *i.e.*, those routinely occurring under the overall Preussag Group system—are more properly considered

---

[12]   The Dalton court also held that neither Midland's advertising, the emphasis of which was national, nor its vessel purchases, for which the sale contracts were executed, paid, and delivered outside Louisiana, provided for jurisdiction. *Id.* at 1362 n.3.

21

as part of an alter ego analysis, rather than as examples of Preussag AG's direct contacts with Texas. *See also Alpine View Co. Ltd. v. Atlas Copco AB*, No. 97-20879, slip op. at *8-9 (5th Cir. Feb. 25, 2000) (op. on remand) (holding (1) foreign holding company was not subject to Texas jurisdiction because of its subsidiaries' activities there absent alter ego showing; (2) considering holding company's receipt of dividends from, interest-bearing loans to, and percentage ownership in subsidiaries only in alter ego analysis; and (3) concluding no alter ego showing was made).

### 2. Other Jurisdictions' Case Law: Personal Jurisdiction over Nonresident Parent Corporation

Appellees rely on four decisions of the federal district court for the eastern district of Wisconsin, each of which we distinguish. In *Handlos v. Litton Industries, Inc.*, the court considered whether two wholly owned subsidiaries, which plaintiff served with process on behalf of their nonresident parent corporation, were the parent's agents or alter egos, so that the parent was "doing business" under the Wisconsin long-arm statute through them. 304 F. Supp. 347, 348 (E.D. Wis. 1969). The *Handlos* court concluded there was sufficient evidence of both, and it denied the motion to dismiss. *Id.* at 350-51. Here, in contrast, appellees disavow either agency or alter ego theory.

Appellees also rely on *Hayeland v. Jaques*, in which there was federal-question jurisdiction based on federal statute. 847 F. Supp. 630, 632 (E.D. Wis. 1994). The *Hayeland* court first noted that, when a federally created right is at issue, the Fifth Amendment's due process clause applies, rather than that of the Fourteenth Amendment. *Id.* It then adopted the

22

minority view that, to determine personal jurisdiction when a federal question is involved, the

court need look only to a defendant's "national contacts," rather than to its contacts with the

state in which the federal court sits:

> When exercising the power of the national sovereign, logic suggests that a
> federal court is not limited by the same constitutional concerns that limit the
> power of a state sovereign. Of course, a forum state's long-arm statute must
> still be satisfied. . . . But once the requirements of the long-arm statute are met,
> the only due process concern should be whether the defendant has sufficient
> *national contacts* such that the exercise of jurisdiction by the nation's courts
> under the nation's laws does not offend traditional notions of fair play and
> substantial justice. *Here, it is clear that [the nonresident defendant] has*
> *extensive contacts with the United States.* The only remaining question is
> whether jurisdiction is satisfied under Wisconsin's long-arm statute.

*Id.* at 634 (emphasis added). The *Hayeland* court then concluded that the nonresident

defendant was amenable to suit under the Wisconsin long-arm statute through the actions of

its Wisconsin subsidiary, because case law interpreting that statute had held a subsidiary's

actions could be so considered.[13]  *Id.*  In contrast, a "national contacts" analysis does not apply

in state court, and *Hayeland* was decided under statute, not the due process clause.

Appellees next rely on *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, in which a

Wisconsin manufacturer sued two Japanese manufacturers for patent infringement. 575 F.

Supp. 1412, 1415 (E.D. Wis. 1983). The Japanese companies sold products other than those

at issue in the suit through partially or wholly owned U.S. subsidiaries, which in turn made

---

[13]     The Wisconsin long-arm statute provided for jurisdiction over a defendant that "is
engaged in substantial and not isolated activities within this state, *whether such*
*activities are wholly interstate, intrastate, or otherwise.*" WIS. STAT. § 801.05(1)(d)
(1994) (emphasis added).

substantial sales of these products in Wisconsin. *Id.* at 1415-16. The *Brunswick* court held as follows:

> This court believes that the constitutional analysis under *International Shoe* permits consideration of a nonresident defendant's contacts with the forum state through its wholly owned subsidiaries without regard to whether the affiliated corporations have maintained a formal separation of corporate identities. Thus, *Cannon*[14] does not preclude this Court from considering the Wisconsin contacts of the [two Japanese parent corporations'] subsidiaries in judging the fairness under the due process clause of requiring the Japanese parents to defend themselves in this forum.

*Id.* at 1419. Without using agency or alter ego theories, the *Brunswick* court then held that, considering the *subsidiaries'* activities, it could exercise jurisdiction over the *parent* corporations under both the Wisconsin long-arm statute and the due process clause. *Id.* at 1422-23. We distinguish *Brunswick* in that the parent corporations there were using their subsidiaries to market and sell the parents' products, while here, Preussag AG is not marketing anything through its Texas subsidiaries. *See id.* at 1415-16. To the extent *Brunswick* is not distinguishable, though, we find it contrary to the Texas precedent cited above, requiring alter ego or agency theory for a subsidiary's actions to be attributed to the parent for jurisdictional purposes. *See Conner*, 944 S.W.2d at 418; *McFee v. Chevron Int'l Oil Co., Inc.*, 753 S.W.2d 469, 471 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Beech*, 818 F.2d at 375-76. *Cf. 3-D Elec.*, 706 S.W.2d at 139 (applying same rule between two corporations that were not parent and subsidiary).

Appellees also rely on *Johnson Worldwide Associates, Inc. v. Brunton Co.*, which

---

[14]    *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333; 45 S. Ct. 250 (1925).

involved a 15-year licensing agreement between two unrelated corporations—one of which was a resident (Johnson Worldwide) and one of which was not (Silva, Brunton's parent)—under which the parties' business dealings were extensive. 12 F. Supp.2d 901, 904-05, 907-08 (E. D. Wis. 1998). In fact, because the dispute arose out of the termination of that licensing agreement, the *Johnson* court held it also had specific, as well as general, personal jurisdiction over the nonresident corporation. *Id.* at 911. *Johnson Worldwide* is, therefore, distinguishable.

Finally, appellees cite *Lung v. Yachts International, Ltd.*, in which the court determined it had specific jurisdiction—a less rigorous test—over a nonresident that allegedly breached a contract and defrauded Wisconsin state residents. 980 F. Supp. 1362, 1367-68 (D. Hawaii 1997). *Lung* is likewise distinguishable.

### 3.   Application

We conclude that Preussag AG's routine activities within the Preussag Group system with its six indirect Texas subsidiaries do not make Preussag AG amenable to suit in Texas.

The six indirect Texas subsidiaries' use of Preussag AG's "banking" and financing systems does not show Preussag AG's purposeful contacts with Texas. Preussag AG's services were provided to the six indirect Texas subsidiaries as they would be to any member of the Preussag Group in any location. In *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin,* the court held a Mexican bank's (1) $1.5 billion in "pass-through" accounts in 11 U.S. banks, through which it facilitated its Mexican clients' foreign transactions, and (2) lines of credit the Mexican bank maintained with

25

Texas banks, but which were used only to support the Mexican bank's clients that imported U.S. goods, did not result in general jurisdiction. 974 S.W.2d 918, 926 (Tex. App.—El Paso 1998, no pet.). The *Primera Vista* court reasoned as follows:

> Although Banca Serfin charged its Mexican customers for use of the Texas bank accounts and lines of credit, its maintenance and use of the accounts is more in the nature of facilitating its Mexican customers' business activities. Accordingly, there was evidence from which the trial court could have reasonably concluded that Banca Serfin's Texas accounts are a by-product of Banca Serfin's business in Mexico with Mexican importer customers rather than an indication of any substantial, purposeful business activity conducted by Banca Serfin on its own behalf in Texas. By maintaining and charging for the use of the Texas accounts, Banca Serfin clearly conducts some marginal business activity in the state. This activity alone, however, is somewhat attenuated and not substantial enough to subject Banco Serfin to suit in Texas for all purposes.

*Id.* at 926. Like the pass-through accounts of the Mexican bank in *Primera Vista*, Preussag AG's "banking" system—in which Preussag Group members deposit excess funds daily with Preussag AG, Preussag AG lends money on commercial terms, Preussag AG credits and debits members' accounts for inter-member sales, and foreign currency transactions are conducted—exists to accommodate the whole Preussag Group, of which Preussag AG is a part. The fact that Preussag AG deposits funds under this system in some subsidiaries' Texas bank accounts is a fortuitous contact, since the "banking" system is not itself directed toward Texas. *Cf. Alpine View*, slip op. at *9 (in holding foreign holding company's Texas subsidiaries were not its alter ego and, thus, Texas had no jurisdiction over former, stating, "The existence of intercorporate loans does not establish the requisite [alter ego] dominance, and, in fact, interest-bearing loans suggest separation of corporate entities.") (citations omitted). Therefore, we conclude that Preussag AG did not purposefully avail itself of conducting

26

business in Texas.

Neither do we place much weight on the communications between some of the six indirect Texas subsidiaries and Preussag AG. In all, appellees' brief cites to fewer than 60 written communications—including currency exchange and deposit confirmations—among Preussag AG and all six Texas subsidiaries from 1987 to 1995. Many of these written communications concerned the financial reporting required by German law, periodic audits, or loans under the Preussag Group "banking" system, all of which we consider part of the normal relations between this parent and its subsidiaries. For the same reason, it is not surprising that Preussag AG and Delta and Pipetronix would communicate by phone.[15]

Aside from occasional visits of Preussag AG representatives for audits, and once for an inspection of Delta, the only other visits between Texas subsidiaries' personnel and that of Preussag AG were outside of Texas. Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact. *See Garner*, 966 S.W.2d at 803 (holding no general jurisdiction over individual who made eight to 10 visits over 60 days to Texas); *compare Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418; 104 S. Ct. 1868, 1870, 1874 (1984) (finding no general personal jurisdiction despite defendant corporation's sending management and personnel to Texas for consultation and training over seven-year period). Moreover, we perceive Preussag AG's monitoring of its six indirect Texas

---

[15]     Moreover, Delta called Hanover (presumably Preussag AG) only about 35 times over several years, and we cannot discern how many of Pipetronix's calls to Hanover were to Preussag AG or to Anlagenbau, the latter of which Pipetronix's officer speculated his company might have sometimes called.

subsidiaries through periodic audits, and its approval of Delta's large expenditures, as part of the normal, parent-subsidiary relationship between these companies.

The fact that the six indirect subsidiaries reported financial information that was relayed to Preussag AG does not weigh in favor of finding jurisdiction, either. This information was required by German law, not just for Preussag AG's own benefit, and was apparently part of the normal parent-subsidiary relationship under the Preussag Group system. Neither is it surprising that Preussag Group companies would use a unified software and reporting system to compile this information. This activity was directed at *all* subsidiaries in which Preussag AG had at least a 50 percent interest, not just at subsidiaries in Texas. The mere existence of a unified, international system between a parent and its subsidiaries does not show purposeful availment of Texas's benefits.

Finally, the excess liability policy Preussag AG maintains for its subsidiaries benefits them, not it, and does not show purposeful availment of anything in Texas.

**B.      Preussag AG's Comfort Letter**

Preussag AG wrote a "comfort letter" that could be used in support of loans that *PNA* might take out on Delta's behalf. There is no showing the letter was written to or for a Texas lender, as Delta's president testified none of PIC's lenders was in Texas, and there is nothing systematic or continuous about it in any event.

**C.      Preussag AG's Two Contracts**

We do not find Preussag AG's contracting twice, six years apart, with Texas corporations to show systematic and continuous contact with Texas.

28

Mere contracting with a Texas resident does not satisfy the minimum contacts requirement. *See, e.g., Magnolia Gas Co. v. Knight Equip. & Mfg. Corp.*, 994 S.W.2d 684, 691 (Tex. App.—San Antonio 1998, no pet.) (contract dispute). In the 1986 transaction, Preussag AG sold back its stock in Preussag Oil & Gas. If anything, this shows Preussag AG's desire to distance itself from Texas. Likewise, the 1992 merger was between PB-KBB and Preussag Oil & Gas. Appellees rely on the agreement's reference to the Texas Business Corporation Act, but it was *PB-KBB and Preussag Oil & Gas*, not Preussag AG, that recited they were merging pursuant to that act. Preussag AG signed the agreement not as a principal, but as an indemnitor for pre-merger environmental liability of its former indirect subsidiary. In doing so, Preussag AG assumed liability related to a Texas merger; it did not avail itself of any privileges or benefits of doing business in Texas.

Each contract contained a choice-of-law clause, *but only for matters relating to those contracts*. A choice-of-law provision is a consideration. *See Burger King*, 471 U.S. at 482; 105 S. Ct. at 2187; *Project Eng'g USA Corp. v. Gator Hawk, Inc.*, 833 S.W.2d 716, 722 (Tex. App.—Houston [1st Dist.] 1992, no writ) (contract containing choice-of-law and choice-of-forum clauses). However, standing alone, it cannot suffice to confer jurisdiction. *See Burger King*, 471 U.S. at 482; 105 S. Ct. at 2187. Nor does it indicate a voluntary submission to the personal jurisdiction of the state's courts in the absence of any express understanding to that effect. *3-D Elec.*, 706 S.W.2d at 145 n.9. Here, if these choice-of-law clauses showed voluntary submission at all, they showed it only for disputes arising from those two particular

contracts.[16]

## D.     Preussag AG's Retention of a Houston Law Firm

Although the majority of the law firm's invoices were sent to or were for services for

Preussag Oil & Gas, we must presume the trial judge found that a few of the firm's services

were performed for Preussag AG.  However, we conclude that these services do not amount

to substantial or systematic and continuous contact with Texas.  *Cf. Wilson v. Belin*, 20 F.3d

644, 650-51 (5th Cir. 1994) (holding no general personal jurisdiction in a defamation suit

despite nonresident's carrying legal malpractice insurance through a Texas law firm for less

than a year, performing at least one legal project a year over three years for various Texas law

firms, and being a pro bono consultant of a Texas historical society for several years).

*Contrast Commonwealth of Puerto Rico v. SS ZOE COLOCOTRONI*, 628 F.2d 652, 667-68

(1st Cir. 1980) (holding general personal jurisdiction existed over British insurers when (1)

ships insured by them were involved, in the forum's waters, in numerous incidents giving rise

to claims; (2) the insurers' local law firm, acting as the insurers' local correspondent, was

instructed to take actions to forestall claims, to provide services for insured shipowners, or

to prepare for litigation; and (3) the insurers advertised to their insured shipowners that the

---

[16]     We realize the *Gator Hawk* court considered, in determining personal jurisdiction, a
choice-of-law provision in a contract that was not the subject of that suit, but we
distinguish that case because (1) the contract also contained a choice-of-forum clause,
(2) the defendant had more direct contacts with Texas than Preussag AG did, and (3) the
defendant put on little proof to carry its burden.  *See Project Eng'g USA Corp. v.
Gator Hawk, Inc.*, 833 S.W.2d 716, 720-21 (Tex. App.—Houston [1st Dist.] 1992, no
writ).

above services would be available through this law firm).

Additionally, some of the contacts with Vinson & Elkins are irrelevant because of when they took place. Federal authority indicates that contacts occurring after suit is filed are irrelevant because "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-70 (2nd Cir. 1996); *see also Noonan v. Winston Co.*, 135 F.3d 85, 94-95 (1st Cir. 1998); *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 n.1 (5th Cir. 1990); *Haas v. A.M. King Indus., Inc.*, 28 F. Supp.2d 644, 648 (D. Utah 1998). Some Texas authority implies that the relevant contacts are those up to the time of the injury. *See Scott v. Cheramie, Inc.*, 833 S.W.2d 240, 242 (Tex. App.—Houston [14th Dist.] 1992, no writ); *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 45 (Tex. App.—Houston [14th Dist.] 1985), *writ ref'd n.r.e.*, 699 S.W.2d 199 (Tex. 1985). Whether the cut-off date for determining general jurisdiction is the date of the injury or the date the suit is filed, the result is the same: the majority of the 16 items of correspondence between Preussag AG and Vinson & Elkins were generated after this suit's filing and are irrelevant to the jurisdictional inquiry. Similarly, a Vinson & Elkins's attorney's post-petition service on PNA's board is irrelevant and, in any event, would not show *Preussag AG's* purposeful availment of anything in Texas. Likewise, Preussag AG's post-petition promise to hold that attorney harmless in that position would be neither relevant nor, if relevant, "continuous and systematic."

31

### D.    Resolution

We hold that Preussag AG did not purposefully establish minimum contacts with Texas on a continuous and systematic basis.  Therefore, we hold Texas courts have no jurisdiction over it.  Because we conclude that no general personal jurisdiction exists over Preussag AG, we need not decide whether exercise of that jurisdiction would comport with notions of fair play and substantial justice.  *See, e.g., Reyes v. Marine Drilling Cos.*, 944 S.W.2d 401, 405 (Tex. App.—Houston [14th Dist.] 1997, no writ).

## VI.  Conclusion

We reverse the order denying Preussag AG's special appearance and remand with instructions to dismiss Preussag AG for lack of personal jurisdiction.

Murry B. Cohen,
Justice

Panel consists of Justices Cohen, Nuchia, and Duggan.[17]

Publish.  TEX. R. APP. P. 47.

---

[17]    The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

32

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOSEPH HUERTA, INDIVIDUALLY §
& AS NEXT FRIEND OF TRISTAN §
JOSEPH HUERTA, A MINOR CHILD §
§
v. §                                    CIVIL ACTION NO. C-00-123
§                                        (HONORABLE JANIS GRAHAM JACK)
VAIL CORPORATION, VAIL RESORTS, §
INC. AND CORPUS CHRISTI §
INSTITUTE OF PAIN MANAGEMENT §

## ORDER

This Court FINDS that the Motion to Transfer Venue under 28 U.S.C. § 1404 filed by Vail

Corporation and Vail Resorts, Inc. is meritorious and therefore should be GRANTED.   It is

therefore,

ORDERED that Plaintiffs' claim against Vail Corporation and Vail Resorts, Inc. is hereby

severed and transferred to the District of Colorado.

ORDERED that all costs are taxed against Plaintiffs.

SIGNED on this _____ day of _____, 2000.


_____
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

|  |  |  |
|---|---|---|
| JOSEPH HUERTA, INDIVIDUALLY | § | |
| & AS NEXT FRIEND OF TRISTAN | § | |
| JOSEPH HUERTA, A MINOR CHILD | § | |
| | § | |
| v. | § | CIVIL ACTION NO. C-00-123 |
| | § | (HONORABLE JANIS GRAHAM JACK) |
| VAIL CORPORATION, VAIL RESORTS, | § | |
| INC. AND CORPUS CHRISTI | § | |
| INSTITUTE OF PAIN MANAGEMENT | § | |

### ORDER

This Court FINDS that the Motions to Dismiss under Rule 12 (b)(2) and Rule 12 (b)(3) filed

by Vail Corporation and Vail Resorts, Inc. are meritorious and therefore should be GRANTED.

Further, this Court FINDS that it lacks personal jurisdiction over Vail Corporation and Vail Resorts,

Inc. The Court further FINDS that venue of the claim against Vail Corporation and Vail Resorts,

Inc. in the Southern District of Texas is not proper. It is therefore,

ORDERED that Plaintiffs' claim against Vail Corporation and Vail Resorts, Inc. is hereby

dismissed; and

ORDERED that all costs are taxed against Plaintiffs.

SIGNED on this _____ day of _____, 2000.


_____
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JOSEPH HUERTA, INDIVIDUALLY      §
& AS NEXT FRIEND OF TRISTAN      §
JOSEPH HUERTA, A MINOR CHILD     §
                                 §
v.                               §      CIVIL ACTION NO. C-00-123
                                 §      (HONORABLE JANIS GRAHAM JACK)
VAIL CORPORATION, VAIL RESORTS,  §
INC. AND CORPUS CHRISTI          §
INSTITUTE OF PAIN MANAGEMENT     §

## ORDER

This Court FINDS that the Motion to Transfer Venue under 28 U.S.C. § 1404 filed by Vail

Corporation and Vail Resorts, Inc. is meritorious and therefore should be GRANTED.   It is

therefore,

ORDERED that Plaintiffs' claim against Vail Corporation and Vail Resorts, Inc. is hereby

severed and transferred to the District of Colorado.

ORDERED that all costs are taxed against Plaintiffs.

SIGNED on this ____ day of _____, 2000.


_____
HONORABLE JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE